## HELEN BRABECK, SPECIAL ADMINISTRATRIX OF ESTATE OF FRANK BRABECK, v. CHICAGO & NORTH WESTERN RAILWAY COMPANY.

117 N. W. (2d) 921.

November 9, 1962—No. 38,557.

*Stringer, Donnelly & Sharood,* for appellant.

*Eugene A. Rerat, Frank L. Brady,* and *Harry H. Peterson,* for respondent.

OTIS, JUSTICE.

This action was brought for death by wrongful act under the Federal Employers Liability Act[1] and resulted in a verdict for plaintiff in the sum of $110,000. Defendant appeals from an order denying its motion for judgment n. o. v. or a new trial. The issues presented are: First, whether it was error to receive in evidence an operating rule designated as 7-B; second, whether the amount of the verdict is excessive; third, whether counsel for plaintiff was guilty of prejudicial misconduct in addressing himself to decedent's children in his closing argument; and, fourth, whether the use of previously prepared placards in plaintiff's closing argument was improper.

At the time of his death decedent, Frank Brabeck, was acting as a fieldman in conducting switching operations at defendant's east-side yard, near the Burr Street bridge in St. Paul. On December 18, 1959, Brabeck's working hours were to be from midnight until 8 a. m. That night he was part of a crew which included in addition to himself an engineer, a fireman, a headman, and a foreman named Laurence C. McCann who was in charge of the switching operations. It was the duty of the crew to remove cars from what were designated as tracks No. 7 and No. 9 and switch them into various positions on track No. 8 in order to make up a complete train. All of the tracks ran east and

---

[1] 35 Stat. 65, as amended by 53 Stat. 1404, 45 USCA, § 51.

west, with track No. 7 on the south and track No. 9 on the north. In switching the cars which had to be assembled on track No. 8, the engine backed off the lead track so that its rear faced west. This gave the engineer located on the right of the cab visibility to the south, east, and west. The fireman's vision on the north was obscured by a curve in the track which prevented his seeing the cars at the back of the train. While there were floodlights in the yard, they faced in a westerly direction, and as a result the members of the crew could not be seen except by their signal lights.

The events leading to Brabeck's death occurred sometime between 1 and 2 a. m. Although part of the time he had performed assigned duties in the switching operations between track 8 and the lead track, approximately 20 minutes before his death he advised the switching foreman, McCann, that he was going to uncouple two air hoses on track 9. McCann testified that Brabeck went to track 9, appeared to have coupled the air hoses, and was headed toward the rear end of track 8 when he last saw him. It was McCann's testimony that he expected Brabeck to go to the rear car on track 8 and wait until the switching operations were completed before releasing handbrakes and coupling air hoses on track 8. During a period of 20 minutes after McCann last saw Brabeck on track 9, there were 7 separate movements on track 8 during all of which time Brabeck was out of sight. Thereafter McCann walked down the south side of the train in a westerly direction coupling air hoses. He went around the last car and started back on the north side of the track without seeing Brabeck until he discovered his body lying across the north rail, several cars from the end of the train, with the upper part of his body lying to the north of the track. When McCann found him, Brabeck had been run over and killed. McCann was unable to say whether the airbrakes had been coupled on the cars between Brabeck and the end of the train.

1. Plaintiff predicates liability on the alleged violation of defendant's operating rule 7-B, which was introduced in evidence over defendant's objection. The rule provides as follows:

"When backing or shoving a train, engine or cars, the disappearance

from view of employee or light, by which signals are given, must be construed as a stop signal."

The principal issue is whether the rule is applicable to the facts of this case since it is well settled that a violation of an operating rule may impose liability on an employer if it is the proximate cause of an accident. Tennant v. Peoria & P. U. Ry. Co. 321 U. S. 29, 64 S. Ct. 409, 88 L. ed. 520. At least two decisions have construed the rule which is the subject of this litigation. Case v. St. Louis-San Francisco Ry. Co. (Mo.) 30 S. W. (2d) 1069, and Chicago & N. W. R. Co. v. Grauel (8 Cir.) 160 F. (2d) 820. The court stated in the Grauel case (160 F. [2d] 826):

"* * * From his [the engineer's] admission that he did not stop on the occasion of Grauel's first disappearance from his sight although his duty to stop promptly was imperative, the jury may have concluded that he did not stop as promptly as reasonable care in the circumstances required on Grauel's second disappearance."

Our own court has approved liability based on the violation of an operating rule in Jacobson v. Chicago & N. W. Ry. Co. 221 Minn. 454, 457, 22 N. W. (2d) 455, 458. We there stated:

"* * * Rules and regulations governing the conduct of those employed in a business as complex and dangerous as switching operations in railroad yards are necessary to facilitate carrying on the business and to protect those employed therein. * * * The adoption of rules 'admits the reasonable necessity for the conduct thereby prescribed.' * * * Specific directions made part of rules constitute standards of care, presumably demanded by the exigencies of the business, to which all persons employed in the business are required to conform; and, because the employer ordinarily will discharge his duty of enforcing such rules and other employes presumptively will obey them, an employe reasonably may rely on observance of the rules by other employes until the contrary appears. * * * Where harm is caused to an employe by violating a rule adopted to secure safe conduct of the work, a finding of negligence is justified."

Here both sides introduced expert testimony concerning the ap-

plication of the rule. On behalf of plaintiff a switch foreman testified that under the facts of this case McCann should not have permitted any movement until he knew where Brabeck was. Defendant's expert testified that the rule applied only to members of the crew who were actually and directly involved in shoving or pulling cars in the particular movement which was being completed.

While there is authority for receiving expert testimony of this kind, it is the prerogative of the jury to accept or reject such evidence in determining the facts concerning the application of the rule and in deciding whether a violation of the rule constitutes actionable negligence. Haines v. Reading Co. (3 Cir.) 178 F. (2d) 918. It is the contention of defendant that the rule did not apply to Brabeck because he was not giving signals or otherwise taking part in the movements which caused his death and his disappearance did not occur during that period of time. The defendant argues that Brabeck should have been waiting at the rear of the train and that the crew could not anticipate he would be between cars for any purpose until the movements were completed.

The record does not disclose the reason for Brabeck's being in the position where he was found. Nevertheless, we cannot say as a matter of law the rule excluded him from its protection at the time of his death. Defendant would have us construe the rule to mean that only an employee who is using a light to signal a movement is covered by it. We think this is too narrow a construction and that the jury was justified in finding that the disappearance of any signal light by an employee who is part of a particular switching crew is intended as a stop signal. It is undisputed that Brabeck had been assigned duties with respect to releasing handbrakes and coupling air hoses on track 8, the only issue being at what point in the movement he was to perform these duties. Although McCann based his testimony entirely on what he assumed Brabeck was about to do, we hold that the jury was warranted in finding that Brabeck went between the cars in reliance on the switching foreman's holding up further movements until Brabeck's light reappeared. It was for the jury to decide whether the rule was violated, and, if so, whether such violation constituted negligence on McCann's part for which defendant was liable.

2. Defendant asserts that the verdict of $110,000 is excessive in that it permits Brabeck's earnings to be continued in perpetuity; that it fails to take into account his own living expenses; and that it was predicated on services rendered his family not constituting pecuniary loss within the limitations of the law governing damages under F. E. L. A. We do not propose either to justify or attack the verdict by comparison with verdicts approved or disapproved in other cases. At the time of his death, Brabeck was 48 years of age, had an expectancy of 22 to 25 years, and was earning $6,200 a year. He was supporting a wife and five children whose ages ranged from 7 to 16. It is the position of defendant that it was improper for the jury to award damages for the loss to the family of such services as reading books, driving the children to school and church, taking part in family outings, participating in athletics with the boys, and conducting their religious education.

A number of decisions under F. E. L. A. have specified the damages contemplated by the act. In Michigan C. R. Co. v. Vreeland, 227 U. S. 59, 71, 33 S. Ct. 192, 196, 57 L. ed. 417, 422, the Supreme Court of the United States held that "pecuniary loss" is not so narrow as to exclude damages "for the loss of that care, counsel, training, and education which [a child] might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation." In the Vreeland case the court pointed out that the deprivation of a parent's nurture, intellectual, moral, and physical training may be a proper matter for compensation over and above the loss of support and maintenance. The Federal courts have consistently applied this measure of damages in recent cases. Moore-McCormack Lines, Inc. v. Richardson (2 Cir.) 295 F. (2d) 583, 588; Petition of Midwest Towing Co. (E. D. Ill.) 203 F. Supp. 727, 732; Thomas v. Conemaugh Black Lick R. (W. D. Pa.) 133 F. Supp. 533, 543. In the Thomas case the court stated:

"The jury heard testimony that the children received unusual religious, moral and intellectual training, as well as physical training, from their father. The rearing of a child entails far more than merely supplying the necessary food, clothing and shelter. Its mental, moral and

physical training are the keystone to the arch of future living and good citizenship."

The court then computed the cost of hiring instructors or teachers to impart training of this kind. In determining the measure of damages under our own death-by-wrongful-act statute, Minn. St. 573.02, subd. 1, we have recently adopted a similar rule. Fussner v. Andert, 261 Minn. 347, 359, 113 N. W. (2d) 355, 363. As applied to the facts of the instant case, we hold there was no impropriety in counsel's arguing as he did the pecuniary value of the various activities in which decedent could reasonably have been expected to take part with his family.

Since the verdict does not segregate the damages for loss of services to the family from damages for loss of support and maintenance, we have no way of knowing how much was allocated to each. Therefore any attempt to reconstruct, by reference to his life expectancy, the amount awarded for loss of support, in order to ascertain whether the jury had a reasonable rate of return in mind, is futile.

3. The defendant assigns as error the conduct of plaintiff's counsel in directly addressing himself to the decedent's children, who were seated in the courtroom, in the following language:

"* * * It's a great loss, not only to you children, but I want to tell you, you should feel proud of your Dad and at the same time it's a loss to the entire State of Minnesota because those kind of men are real men. * * * I suppose people don't know unless they are in that position themselves. They probably don't understand what some of these things mean. But I am sure that these little tots do since they have lost their father. You understand and you will more in the future because you lost a wonderful father."

We do not hesitate to condemn counsel's tactics as an unwarranted attempt to exploit the grief and misfortune of these unhappy young children. Whether this misconduct infected the jury's determination of liability is a more difficult question. Although we are not entirely free from doubt in the matter, we believe that substantial justice will be achieved by ordering a new trial on all issues unless within 5 days

plaintiff files a consent to a reduction of the judgment to $90,000.[2]

Plaintiff asserts that defendant is foreclosed from questioning counsel's closing argument by failing to make timely objection and to ask for a corrective instruction. He cites State v. Jansen, 207 Minn. 250, 257, 290 N. W. 557, 561. Suffice it to say that the rule relied on by plaintiff has no application where the argument is so prejudicial that the trial court should have taken appropriate action sua sponte. Magistad v. Potter, 227 Minn. 570, 36 N. W. (2d) 400; Maher v. Roisner, 239 Minn. 115, 117, 57 N. W. (2d) 810, 811, 37 A. L. R. (2d) 658.

4. Defendant argues for reversal because of the use by plaintiff's counsel in his final argument of placards showing the decedent's age, life expectancy, income, the ages of his children, the amount claimed for the loss of services to each, the particular services the decedent rendered his family, and a computation of damages based on expectancy and income at various rates of interest. While we have condoned the use of a mathematical formula for purely illustrative purposes in arguing damages,[3] we have never squarely passed on the use of previously prepared placards. A number of other jurisdictions have done so, however. A leading case on the subject is Four-County Elec. Power Assn. v. Clardy, 221 Miss. 403, 73 So. (2d) 144, 44 A. L. R. (2d) 1191. There the court delineated the boundaries within which placards may be used in opening statements or closing arguments, holding that there was no objection to such a device provided the information contained on the placards was supported by some evidence and the placards were not visible except during the opening statement or closing argument and were not made available to the jury during their deliberations.[4] We concur in this view.

---

[2]As to the propriety of remittitur, see Patton v. Baltimore & O. R. Co. (W. D. Pa.) 120 F. Supp. 659, 666; Butler v. Williams (Fla. App.) 133 So. (2d) 109; Romano v. Dibbs, 256 Minn. 332, 98 N. W. (2d) 146; McCrank v. G. N. Ry. Co. 260 Minn. 329, 109 N. W. (2d) 582.

[3]Boutang v. Twin City Motor Bus Co. 248 Minn. 240, 250, 80 N. W. (2d) 30, 39.

[4]See, Annotations, 44 A. L. R. (2d) 1205 and 80 A. L. R. (2d) 1270; see, also, King v. Railway Exp. Agency, Inc. (N. D.) 107 N. W. (2d) 509, 516; Egenberger v. National Alfalfa Dehydrating & Milling Co. 164 Neb.

More recently the Florida Court of Appeals considered the propriety of using a blackboard, chart, or placard in final argument and held that this practice is permissible if it is limited in such a way as to avoid prejudice to the opposing party. Ratner v. Arrington (Fla. App.) 111 So. (2d) 82. The court stated that the trial court could in its discretion allow the use of a placard (111 So. [2d] 86) "in illustration and aid of argument of counsel, to show any matter which counsel could state to the jury in proper argument."

In accordance with our own practice and the reasoning of the authorities cited, we hold that it is not improper in closing argument to use previously prepared placards, provided they contain only factual statements supported by the evidence and are not argumentative in nature. Just where evidence ends and argument begins is a matter for the trial court to determine within its broad discretion in each case. Here the only statement in the placards finding no support in the evidence was the rate of interest to be expected by a woman lacking business training in making a safe investment. We do not consider this departure from the record to be a ground for reversal. However, in order to obviate in the future the display of charts or placards which are not supported by the evidence or tend to be argumentative, we hold that the proposed material should be submitted to the court and to opposing counsel in chambers prior to argument whenever the use of such visual aids is anticipated.

Affirmed on condition plaintiff file with clerk of this court within 5 days written consent to reduction of judgment to $90,000; otherwise, new trial granted.

---

704, 729, 83 N. W. (2d) 523, 540; Bone v. General Motors Corp. (Mo.) 322 S. W. (2d) 916, 924, 71 A. L. R. (2d) 361, 373; Affett v. Milwaukee & Suburban Transport Corp. 11 Wis. (2d) 604, 614, 106 N. W. (2d) 274, 280; Haycock v. Christie, 101 App. D. C. 409, 410, 249 F. (2d) 501, 502.