STATE of Minnesota, Respondent,

v.

**Jimmy Robert HUMMEL, Appellant.**

No. C4–90–2416.

Supreme Court of Minnesota.

April 17, 1992.

Steven J. Meshbesher, Sean M. Quinn, Meshbesher, Birrell & Dunlap, Ltd., Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, and Stephen Rathke, Crow Wing County Atty., Brainerd, for respondent.

## OPINION

GARDEBRING, Justice.

This is an appeal by the petitioner, Jimmy Robert Hummel, from his 1990 conviction for first degree murder in the 1989

killing of Shana Pesheck. The petitioner, then 16, was certified to stand trial as an adult, and that decision was affirmed. *In re the Matter of the Welfare of J.R.H.*, C3–89–2045, 1990 WL 81402 (Minn.App. June 19, 1990), *pet. for rev. denied* (Minn. July 31, 1990). Petitioner was indicted on two counts of first degree murder (premeditated and felony-burglary), two counts of second degree murder (intentional and felony) and one count of third degree murder. After a jury trial, petitioner was convicted of first degree murder and sentenced to life in prison. On appeal, petitioner argues his constitutional rights were violated when the trial court (a) declined his request to conduct an *in camera* inspection of the victim's psychiatric/psychological records; (b) denied a motion to suppress evidence gained from two warrantless searches; and (c) allowed into evidence photographs and videotape of the victim's body at the crime scene and photographs from the autopsy. We affirm.

## I.

Petitioner and Shana Pesheck began dating in 1988. They argued and fought frequently, and by the spring of 1989, although they still saw each other often and talked on the telephone daily, the relationship was deteriorating. At approximately 10:30 p.m. on July 26, 1989, petitioner was at his home, talking with Ms. Pesheck on the telephone. They had a long, heated conversation; petitioner hung up five times, and Ms. Pesheck called back each time. After the calls, petitioner decided to drive to Ms. Pesheck's house to see her. However, petitioner's car was not yet insured and his mother would not give him the keys. Petitioner left on foot, grabbing what his mother believed to be a knife. Petitioner's father set off to find him, and petitioner's brother called the police and Ms. Pesheck. A sheriff's deputy went to Ms. Pesheck's home to warn her. Ms. Pesheck said she did not consider petitioner a threat, but she did agree to lock the doors. About an hour after petitioner left his home, police were notified that he had returned without going to Ms. Pesheck's house. Petitioner, still upset, stayed up

until 1:30 a.m., then went to his bedroom. Meanwhile, Ms. Pesheck had gone to sleep on her family's living-room couch. Sometime during the early-morning hours, petitioner drove his mother's car to Ms. Pesheck's home and stabbed her to death.

At 5:30 a.m. on July 27, the victim's mother awoke to find the body, later determined to have 21 or 22 stab wounds. The mother called police, and one of the first officers to arrive was Deputy Sheriff James Peterson, who was aware of the call to police the night before. Peterson went inside the house and surveyed the scene. Later, he and Brainerd Patrolman Terry Crocker left for the Hummel house. They arrived at about 6:20 a.m. Petitioner's mother answered the door, and Peterson, who was in street clothes, showed her his badge and identification card and asked if petitioner was home. When Mrs. Hummel said yes, Peterson said he needed to talk to petitioner and it was important. Mrs. Hummel, followed by Peterson, went to petitioner's bedroom, but he was not there and the window screen had been cut. By that time, petitioner's father also was awake, and Peterson told both parents that petitioner was a possible suspect in a homicide. Peterson asked where petitioner might be and whether he had access to any firearms. Petitioner's father went to see if any guns were missing and Peterson followed. While they looked for a shotgun in petitioner's room, Peterson noticed a shirt and pair of white shorts covered with what appeared to be blood.

Peterson returned outside, where Crocker told him that in looking at a car in the driveway he had seen blood on the car, on the keys in the ignition, and on two knives on the floor of the passenger side. Shortly thereafter, Chief Sheriff's Deputy Irv Tollefson arrived at the Hummels' home with consent-to-search forms. Peterson filled out a form, presented it to petitioner's father, explained what it was and asked him to sign. However, Peterson noticed that Mr. Hummel was having trouble reading the form and suggested that he show it to Mrs. Hummel, which Mr. Hummel did. Peterson explained the form to Mrs. Hummel,

who looked it over, gave it back to her husband, and indicated approval to sign it, which Mr. and Mrs. Hummel both did. Inside the house, the officers retrieved the bloody clothing from petitioner's bedroom. Later that morning, petitioner was arrested after he was found sleeping in a deer stand behind his parents' home.

Before trial, petitioner made motions for (a) the court to subpoena and conduct an *in camera* inspection of the victim's psychiatric/psychological records from Grace Unit, a treatment facility for adolescents, where both the victim and petitioner had been hospitalized; (b) a change of venue; (c) suppression of a statement petitioner made to police; and (d) suppression of evidence gained from the searches of petitioner's home. The statement was suppressed, but petitioner's other motions were denied. At trial, the bloody clothing found in the Hummel home was admitted. The trial court also admitted twelve photographs of the victim's body at the death scene, seven photographs showing blood splatters, ten photographs from the autopsy, several diagrams of the body from the autopsy, and a videotape of the crime scene. The videotape did not go to the jury. The trial court felt the videotape might be cumulative, but decided to allow it in. On appeal, petitioner raises the following issues:

(1) Did the trial court violate petitioner's fourteenth amendment right to due process when it declined his request to subpoena and review, *in camera*, a psychiatric/psychological file on the victim?

(2) Did the trial court violate petitioner's rights under the fourth and fourteenth amendments by admitting evidence gained in two warrantless searches?

(3) Did the trial court violate petitioner's right to a fair trial by admitting into evidence twelve photographs of the victim at the death scene, seven photographs of blood splatters, ten photographs from the autopsy and a videotape from the death scene?

(4) Did the cumulative effect of these decisions violate petitioner's right to a fair trial?

## II.

■ The first issue in this case is under what circumstances must a trial court review, *in camera*, confidential medical records when requested by a defendant to do so. The question arises in the context of petitioner requesting *in camera* review with no showing of relatedness to the case.

"There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). But due process requires that "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Ritchie v. Pennsylvania*, 480 U.S. 39, 56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40 (1987). Under the Minnesota rules, a defendant may seek a discovery order from the court in its discretion, Minn.R.Crim.P. 9.01, subd. 2(3), or request a subpoena of witnesses and records, Minn.R.Crim.P. 22.01, 22.02. The rules "are intended to give the defendant and prosecution as complete discovery as is possible under constitutional limitations." Minn.R.Crim.P. 9.03, Comment, para. 1.

At the same time, Minn.Stat. § 595.02 subd. 1(d) and (g) (1988) prohibits unauthorized disclosure of medical and psychiatric/psychological information. At issue, then, is how these competing concerns are to be reconciled.[1] "[T]he medical privilege, like other privileges, sometimes must give way to the defendant's right to confront his accusers." *State v. Kutchara*, 350 N.W.2d 924, 926 (Minn.1984). *See also State v. Paradee*, 403 N.W.2d 640 (Minn.1987) (adopting the *Ritchie* analysis for child welfare reports in criminal sexual conduct case).

But a defendant may not have direct access to the confidential material sought. It first must be screened by the trial court.

1. Ms. Pesheck's death does not negate the issue because the medical privilege survives its holder's death. *In re Estate of Koenig*, 247 Minn. 580, 585, 78 N.W.2d 364, 367 (1956).

"The in camera approach strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in obtaining all relevant evidence." *Paradee*, 403 N.W.2d at 642.

In this case, petitioner argued that he was entitled, under *Ritchie* and *Paradee*, to have the trial court examine the victim's records *in camera.* The trial court denied the motion, reading *Ritchie* and Minn. R.Crim.P. 9.03(6) as requiring an offer of proof that the material sought was relevant and contained exculpatory information. Petitioner argues, correctly, that the trial court applied the wrong standard in relying on Rule 9.03(6);[2] however, the conclusion of the trial court was correct, nonetheless.

The *Ritchie* Court said in a footnote that a defendant may not have a confidential file reviewed "without first establishing a basis for his claim that it contains material evidence." *Ritchie*, 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15. He must make some "plausible showing" that the information sought would be "both material and favorable to his defense." *Id.*, (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)).

While the *Ritchie* standard does not give trial courts detailed guidance, we conclude that the showing made by the petitioner was insufficient to trigger the need for *in camera* review. His motion and brief gave the trial court no theories on how the file could be related to the defense or why the file was reasonably likely to contain information related to the case. Petitioner cannot complain that he was denied notice of the requirement that he show some connection between the file and his case. The *Ritchie* Court's analysis, which we adopted in *Paradee*, makes it absolutely clear that *some* showing is required before *in camera* review is granted. *Ritchie*, 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15. Petitioner made *no* showing to the trial court, which

is deficient under any applicable standard. Contrary to petitioner's position, having the trial court review confidential material is not a right. It is a discovery option, but only after certain prerequisites are satisfied. In this case, they were not.

There are two warrantless searches at issue in this case. The first involves Deputy Peterson entering the Hummel home behind Mrs. Hummel in the belief that petitioner was in the bedroom. The second concerns the validity of the consent petitioner's parents gave police to re-enter the house.

Under the fourth amendment, warrantless searches and seizures are *per se* unreasonable unless they fall under an established exception. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). That is especially so when it occurs inside a home. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Two of the recognized exceptions are consent and exigent circumstances. *Id.* at 576, 590, 100 S.Ct. at 1374, 1382. If a warrantless search does not fall within a proper exception, its fruits must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).

There are two fact patterns that will justify a warrantless search and/or seizure based on exigent circumstances: (1) a situation in which a single matter, such as a fleeing felon or danger to persons or evidence, is highly compelling; and (2) a "totality of the circumstances" situation. *State v. Gray*, 456 N.W.2d 251, 256 (Minn. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991). To weigh the "totality of the circumstances," courts should apply the factors set forth in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C.Cir.1970). These factors are:

(a) whether a grave or violent offense is involved; (b) whether the suspect is reasonably believed to be armed; (c) whether there is strong probable cause connecting the suspect to the offense; (d)

---

**2.** Under Minn.R.Crim.P. 9.03(6), the trial court "may permit any showing of cause for denial or regulation of discovery, or portion of such

showing, to be made in camera." It has no bearing on the inspection of confidential documents contemplated by *Ritchie* and *Paradee*.

whether police have strong reason to believe the suspect is on the premises; (e) whether it is likely the suspect will escape if not swiftly apprehended; and (f) whether peaceable entry was made.

*Gray,* 456 N.W.2d at 256. The test is not to be applied rigidly. "[T]he *Dorman* factors are part of a flexible approach that encompasses all relevant circumstances." *State v. Olson,* 436 N.W.2d 92, 97 (Minn. 1989), *aff'd,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

 In this case, the trial court properly held that there was no single exigent factor which justified the initial warrantless search of the Hummel house. Rather, the trial court found that the search was justified by the *Dorman* "totality of the circumstances" exigent factors. Unquestionably, this was a grave and violent crime. After police saw the crime scene and before they looked inside a car at petitioner's home, they had reason to believe the suspect was armed with a knife. Police also had strong reason to believe petitioner was on the premises because his mother said so, and it is undisputed that the police entry into the Hummel home was peaceable.

There also was strong probable cause connecting petitioner to the crime. "Probable cause to arrest exists when reasonable grounds for suspicion are accompanied by circumstances sufficiently strong in themselves to warrant a cautious person in believing the accused to be guilty of a crime." *State v. Filipi,* 297 N.W.2d 275, 277 (Minn. 1980). The night before, petitioner's own family was concerned enough about the victim's safety that they called her and the police. That, plus the timing and manner of the victim's death, certainly would establish probable cause to arrest under *Filipi.* It also should be noted that the *Dorman* list is not exhaustive and exigent circumstances also may justify warrantless arrests in the home that are not planned, but that occur "in the field as part of unfolding developments." *Olson,* 436 N.W.2d at 97 (citing 2 W. LaFave, *Search and Seizure* § 6.1(f) at 605–08 (2d ed. 1987) and *State v. Lohnes,* 344 N.W.2d 605, 611 (Minn.1984)).

The only *Dorman* factor lacking is the likelihood the suspect would escape if not quickly apprehended. But there is no requirement that all of the *Dorman* factors be equally satisfied before a warrantless search is justified. In looking at the totality of the circumstances, there was ample cause on the other *Dorman* factors to justify the warrantless entry of the Hummel home. Because the exigent circumstances justified the initial warrantless entry, anything within Deputy Peterson's plain view was lawfully discovered. *See Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

 The second search also was valid. "[C]onsent to search need only be voluntary, that is, uncoerced, and need not be knowing or intelligent." *State v. Alayon,* 459 N.W.2d 325, 330 (Minn.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 757, 112 L.Ed.2d 777 (1991) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Upon review, the trial court's determination of consent will not be overturned unless it is clearly erroneous. *Alayon,* 459 N.W.2d at 330. "Consent must be the product of more than mere submission to legal authority." *State v. High,* 287 Minn. 24, 27, 176 N.W.2d 637, 639 (1970). But "knowledge of a right to refuse is not a prerequisite of a voluntary consent." *Schneckloth,* 412 U.S. at 234, 93 S.Ct. at 2051. Valid consent may be given by a third party who possesses common authority over the premises. *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974). Analyzing the search at issue, it is unimportant whether Mr. Hummel could read and understand the search consent form. Mrs. Hummel, who had common authority over the premises, could read it and, in fact, signed it. There is no evidence of coercion, so the consent must be upheld as valid.

 Petitioner contends that the number and gruesome nature of the photographs and videotape so inflamed the jury that he was denied a fair trial. Petitioner argues there was no need for such evidence, or at least not to the extent used, when petitioner did not deny killing the victim and the

only issue was whether the killing was intended and premeditated.

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

*State v. Alton,* 432 N.W.2d 754, 758 (Minn. 1988) (emphasis in original) (quoting *State v. De Zeler,* 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950)). The admission of photographs is in the discretion of the trial judge. *State v. Daniels,* 361 N.W.2d 819, 828 (Minn.1985).

These cases make it clear that it is within the trial court's discretion to admit photographs, even ghastly ones, so long as they show something that a witness could describe and are material to some relevant issue. The exhibits in this case allowed the jury to better visualize the crime scene. And the extent and type of harm to the victim is material to the issues of intent and premeditation. Also, as the prosecution argued at trial, the videotape gave jurors a different perspective on the scene than the photographs.

This final assertion, while literally true, is extremely weak. The duplicative nature of the videotape troubled the trial court and it troubles this court. We also wonder whether twelve photographs of the blood-covered victim, including three facial close-ups, really were necessary to the state's case, especially when the jury also received ten autopsy photographs that showed the victim's wounds very clearly. On balance, in light of our earlier cases, the trial court did not abuse its discretion by admitting the photographs and videotape.

But we are very concerned about the tendency of some prosecutors to make excessive use of shocking visual evidence from crime scenes. We caution prosecutors and trial courts to examine each visual exhibit of this type very carefully. A photograph or videotape should not be admitted if it is only subtly different from other photographic or video evidence. And such exhibits should be limited to a reasonable quantity. The purpose of visual evidence is to inform jurors, not shock and overwhelm them.

Petitioner next contends that the combined effect of the previously cited issues deprived him of a fair trial. That contention is without merit. "A defendant is entitled to a fair trial but not a perfect one." *State v. Mastrian,* 285 Minn. 51, 75, 171 N.W.2d 695, 710 (1969), *cert. denied,* 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970) (quoting *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968)). In this case, any errors the trial court made were minor, and petitioner was not denied a fair trial.

Affirmed.