**STATE of Minnesota, Respondent,**

v.

**William Joseph ROBINSON, Appellant.**

**No. C3–94–1685.**

Supreme Court of Minnesota.

Oct. 20, 1995.

33

Cathryn Young Middlebrook, Minneapolis, John M. Stuart, Minn. State Public Defender, for appellant.

Hubert H. Humphrey, III, Minn. Atty. Gen., St. Paul, J. Michael Richardson, Minneapolis, Michael O. Freeman, Hennepin County Atty., for respondent.

**OPINION**

GARDEBRING, Justice.

This case is a direct appeal from convictions of first-degree murder (domestic abuse), Minn.Stat. § 609.185(6) (1994), and second-degree murder (intentional), Minn. Stat. § 609.19(1) (1994), a lesser included offense. The convictions arose from the September 1993 stabbing death of Barbara Smith. The appellant, William Joseph Robinson, raises four issues on appeal: 1) the constitutionality of the domestic abuse murder statute; 2) the sufficiency of the evidence on domestic abuse murder; 3) the sufficiency of the evidence on second-degree (intentional) murder; and 4) certain evidentiary rulings made by the trial court. We affirm.

Robinson and Smith met in 1989, and began living together in September of 1990, along with Smith's three children. Their relationship was marked by arguments and physical confrontations, which led to Robinson moving out of their home on three occasions. For several weeks prior to the day of the killing, the relationship between Robinson and Smith had been tense. On that day, Smith and her children had been gone and returned home after having dinner with her sister. Robinson testified at trial that Smith was in a fury when she came home, that she threw her keys at him and that she came at him with an object in her hand. He said that he had no memory of what happened after that, until he was talking to the 911 operator.

Smith's three children, aged 7–13, were home at the time of the killing. The two eldest testified that when they arrived home an argument started between their mother and Robinson. The argument escalated when Robinson took a knife from the kitchen and attacked their mother, who was ultimately stabbed 19 times. She died approximately one hour after the police arrived at the scene, in response to a 911 call made by the eldest child.

When investigating officers Butler and Downing arrived at the scene, Butler called for the parties to come out and saw Robinson walk down the hallway. Officer Butler handcuffed and searched Robinson. Butler testified that Robinson said, "I did it. I know I'm going to jail." Butler said Robinson claimed to be physically hurt, but he could find no evidence that Robinson was injured.

At the police station, detectives read Robinson his *Miranda* warning and interviewed him about the stabbing. The statement made during the 28 minute interview was recorded and later transcribed. Following a pre-trial Rasmussen hearing, the state offered the statement into evidence. In the statement Robinson admits the following:

1. That only one knife was involved in the incident;

2. That he was mellow, not in a rage, during the incident;

3. That he and Smith had been in the relationship for six years;

4. That the entire fight lasted 3–4 minutes;

5. That after the stabbing he didn't go back to the bedroom to see Smith.

6. That when they lived together in Minneapolis they had been through five or six fights.

7. That in the six years they were together he and Smith were in at least ten physical fights.

8. That he and Smith had mutual restraining orders against each other and the judge told him if he had another fight he would go to jail.[1]

At trial, there was evidence of a number of specific incidents which supported the state's domestic abuse murder theory:

1. *September 1990.* Robinson testified he and Smith had an "altercation" that lasted 2 or 3 minutes and involved him grabbing her, shaking each other, loud hollering and Robinson leaving the house. An entry in Smith's diary dated September 23, 1990, stated, "Me & Bill had really bad fight today. He really hurt me. I called off work today. Went to Dr. Had a mild concussion and muscle spasms neck and shoulder. I could hardly move and my head was pounding really bad."

2. *October 1990.* Robinson testified that he and Smith got into a "fist fight." Robinson admitted that during that fight he hit her three times and Smith's injuries included black eyes, a swollen lip and puffy cheeks. Testimony from Smith's co-worker described Smith after the fight in October 1990: "I saw her face having been obviously beaten. Her lips were tremendously swollen. Her eyes were sort of blackish. There were bruises on her cheek bones, and her face was all puffy and swollen. She was a mess." The co-worker also testified that Smith later told her that the injuries were the result of Robinson beating her. An entry in Smith's diary for October 1990 reads in part, "Me and Bill fought I mean really fought. I came out of it with a Black eye and 3 lips and more anger than a black tornado can muster up. * * * That bastard beat me like he cared nothing about me. He kept hitting me and threatening me and hitting and threatening."

3. *July 1992.* Robinson testified that he "shook" Smith during an argument they were having about disciplining the kids. Robinson claimed that Smith pulled a knife on him and threatened to kill him.

4. *August 1992.* Robinson testified that Smith came toward him with a knife and he shook her to calm her down. However, Smith's sister testified that Smith told her that during that fight Smith used a knife against Robinson in self-defense. During that fight a 911 call was made,[2] but when the police arrived at the house Smith was by herself. According to the investigating officer, Smith stated that Robinson had left, that they were fighting because he had been out all day and she gave him a description of Robinson, who was later found going to the hospital for a stab wound to his back.[3]

5. *May 1993.* Two of Smith's children testified that after Smith returned home late from bowling, they heard Robinson and Smith fighting and they could hear crashing and slamming against the wall. Nicki, the 10-year-old, also testified that a day or two later she went with her mother to the hospital because her mother's ears were hurting. When asked about the incident on cross-examination Robinson testified:

Q: And the one the children described as hearing what they described as a slamming. Sound up against the wall?

A: That's the only other one, yes.

Q: To your recollection, was that an accurate description, to the best of your knowledge?

A: Yes.

6. Andre, Smith's 13-year-old son, testified to observing Robinson pick Smith up and slam her to the ground, on an unknown date. Robinson denied the incident.

7. *August 1993.* The police were called to the house because of a "physical alterca-

---

1. There is no other mention in the record of these restraining orders.

2. Robinson testified that he called 911, and Smith ripped the phone out of the wall. However, the responding police officer testified that Smith told him she made the call and Robinson had ripped the phone out of the wall.

3. The parties agreed to have the court read to the jury a stipulation which indicated that Robinson had been treated at approximately 2 a.m. on August 8, 1992, at Hennepin County Emergency Services for a cut on his left shoulder. The stipulation also said that Robinson advised medical personnel that he had been stabbed by his wife a few hours previous with a dull knife.

tion." The investigating officer testified that he had been called on a "domestic" report. When he arrived both Smith and Robinson claimed everything was fine, but they had called the police in case something happened because they had arguments and disputes before.

Furthermore, the state offered the following additional evidence as indicative of past abuse:

1. Robinson's statement to the police which admitted to "five or six fights" while he and Smith lived together in Minneapolis, and at least 10 physical fights throughout the relationship.

2. Robinson's testimony that he and Smith would have "arguments" which he described as: "Basically she would get upset, furious, and I would grab her and hold her, and we would be hollering at each other. So I would be trying to stop her from physically attacking me."

3. Smith's sister's testimony that Smith and Robinson often argued and that Robinson had told her that he hit Smith on three or four separate occasions.

4. Robinson's sister-in-law's testimony that Robinson would come over to her house because he didn't want to go home because he and Smith had been arguing.

Robinson did not deny that he had killed Smith, but asserted that the killing was neither premeditated or intentional. The defense theory was that Robinson acted in the heat of passion, and in support of that theory they offered his testimony that on the night he killed Smith they had gotten into a "heated" and "boisterous" argument. Robinson stated that Smith was in a fury, tossing clothes and furniture around the bedroom, and that she threw his keys at him, told him she hated him and that she would kill him. Next, Robinson claims they got into a "tussle," and then she came towards him as if she was going to attack him. When asked if she had anything in her hands Robinson responded, "An object, as far as I remember. I'm not sure. All I know my blood pressure went up. There was an argument, it was heated."

The defense's other witnesses consisted of Robinson's pastor, a longtime friend, a former girlfriend, several co-workers, his sister, his brother-in-law and his great aunt. The defense witnesses generally testified that Robinson was honest, hard-working and well-liked. Furthermore, his former girlfriend testified that, while she was involved with Robinson from 1984–87, they never fought and he treated her and her daughter very well.

Two evidentiary rulings are now the subject of appeal by Robinson. The first was the trial court's decision to admit autopsy and crime scene photographs and to allow their use during final argument. To support its objection to their admission, the defense argued that the photographs were irrelevant, since Robinson admitted to killing Smith, and that they were inflammatory and designed to prejudice the jury. The trial court admitted 20 photographs and excluded four, relying on Minn.R.Evid. 401–403.

In addition, the trial court, relying on Minn.R.Evid. 401–405, 804 and 805, ruled as inadmissible the proffered testimony from Smith's sister that Smith had used a knife in an incident involving her former husband some 10 years ago. The court held that since the character of the victim was not at issue, the evidence was irrelevant and was also too removed in time.

At the close of evidence, the trial court instructed the jury on first-degree premeditated murder, first-degree domestic abuse murder and second-degree intentional murder.[4] The court also gave jury instructions on the lesser included crimes of second-degree murder, second-degree murder while committing a felony, third-degree murder,

4. Neither party objected to the trial court's use of CRIMJIG 11.05 (Murder in the First–Degree–Premeditation–Issue of Heat of Passion as Element) and CRIMJIG 11.14 (Murder in the Second–Degree–Issue of Heat of Passion as Element), which this court has ruled places the burden on the state to prove beyond a reasonable doubt that the crime was not committed in the heat of passion. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 11.05, 11.14 (3d ed. 1990); *State v. Persitz*, 518 N.W.2d 843, 848 (Minn.1994).

and first-degree manslaughter.[5] No jury instruction was given on self-defense, since the theory of the defense was not that Robinson acted in self-defense, but that he acted in the heat of passion. On the issue of domestic abuse, the trial court instructed the jury as follows:

> Past pattern of domestic abuse means prior acts of domestic abuse which form a reliable sample of observable traits or acts which characterize an individual's behavior. No specific number of prior acts is required.

The defense objected to the last sentence of this instruction.

■■■ We begin with the question of whether the domestic abuse murder statute, Minn.Stat. § 609.185(6) (1994), is void for vagueness because it fails to define the term "pattern" in the phrase "past pattern of domestic abuse." "[W]hen a statute clearly applies to a person's conduct, that person may not successfully challenge the statute for vagueness." *State v. Grube,* 531 N.W.2d 484, 490 (Minn.1995) (citing *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974)); *see also State v. Christie,* 506 N.W.2d 293, 301 (Minn.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1316, 127 L.Ed.2d 666 (1994). We have considered this issue in a recent domestic abuse murder case and concluded there, as we do here, that the acts of abuse proven at trial, including those

to which Robinson admitted, come within any reasonable definition of the word "pattern." *See Grube,* 531 N.W.2d at 491. However, because of the recurring nature of this challenge we take this opportunity to expand our discussion of this issue.

Minnesota's domestic abuse murder statute, Minn.Stat. § 609.185, provides in relevant part:

> Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
> * * *
> (6) causes the death of a human being under circumstances other than those described in clause (1), (2), or (5) while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim and the death occurs under circumstances manifesting an extreme indifference to human life.[6]

■■■ Specifically, Robinson's challenge to the constitutionality of the statute is based on the well-established principle that a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Therefore, a statute is void for vagueness if persons of

---

5. The trial court's first-degree manslaughter instruction was combined with the second-degree murder instruction as follows:

> The elements of Murder in the 2nd Degree are:
> First, the death of Barbara Jean Smith must be proven. Second, Willilam [sic] Joseph Robinson caused the death of Barbara Jean Smith. Third, William Joseph Robinson acted with the intent to kill Barbara Jean Smith.
> * * * * * *
> Fourth, William Joseph Robinson did not act in the heat of passion provoked by such words or acts as would provoke a person of ordinary self-control in like circumstances. Even if William Joseph Robinson acted with the intent to kill Barbara Jean Smith, if he acted in the heat of passion, he is not guilty of Murder in the 2nd Degree. However, such heat of passion is not an excuse for the killing of another person. The heat of passion may cloud his reason and weaken his willpower and this is a circumstance which the law considers in fixing the

degree of crime. If the heat of passion is provoked by words which would provoke a person of ordinary self-control in the same circumstances, the law provides that an intentional killing is Manslaughter in the 1st Degree.

> * * * * * *

> If you have [sic] find that each of these elements has been proved beyond a reasonable doubt except that you find it has not been proved that William Joseph Robinson did not act in the heat of passion, William Joseph Robinson is guilty of Manslaughter in the 1st Degree.

6. This provision, added to the first-degree murder statute in 1990, requires neither premeditation nor specific intent to kill. For a complete history of the provision, see Margaret C. Hobday, Note, *A Constitutional Response to the Realities of Intimate Violence: Minnesota's Domestic Homicide Statute,* 78 Minn.L.Rev. 1285 (1994).

common intelligence must necessarily guess at its meaning or differ as to its application. *State v. Newstrom,* 371 N.W.2d 525 (Minn. 1985).

■ Robinson argues that an undefined word or phrase renders a statute unconstitutionally vague if the meaning of that word or phrase is neither commonly understood nor established by judicial construction in other statutes, and that "pattern" is just such a word. *See Minnesota Wood Specialties, Inc. v. Mattson,* 274 N.W.2d 116, 119 (Minn.1978). A person seeking to challenge a statute as void for vagueness must demonstrate the unconstitutionality of the statute beyond a reasonable doubt. *State v. Merrill,* 450 N.W.2d 318, 321 (Minn.), *cert. denied,* 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990). We conclude that the statute, including the word "pattern," meets the constitutional requirements of clarity.[7]

First, we turn to the statutory canons of construction. Minn.Stat. § 645.08 (1994) says that, "[i]n construing the statutes of this state, * * * [w]ords and phrases are construed * * * according to their common and approved usage; * * *." "Pattern" is defined as "a regular, mainly unvarying way of acting or doing." *Webster's New World Dictionary,* 1042 (2nd ed. 1980). Applied in this context, this definition suggests a regular way of acting by committing acts of domestic abuse.

We may also look to judicial construction of the word "pattern" to assist in our analysis. In 1989, the Supreme Court defined the term "pattern" as used in the federal Racketeer Influenced and Corrupt Organizations Act (RICO). *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); 18 U.S.C § 1961(5) (1995). The Court concluded that whether a pattern is formed turns on the relationship that the individual acts bear to each other or the presence of some organizing principle that renders the acts ordered or arranged. 492 U.S. at 238, 109 S.Ct. at 2900. Robinson himself directs our attention to the Court's earlier analysis of the legislative his-

tory of RICO which defines a pattern of criminal acts as having " 'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics' and are not isolated events." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), (quoting 18 U.S.C. § 3575(e)).

The domestic abuse statute itself contains the "organizing principle" and the "distinguishing characteristics" which fully define a "past pattern of criminal abuse." Minn.Stat. § 609.185(6) defines first-degree murder to include:

> the death of a human being * * * while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim * * *.

The statute further explains the term "pattern" by providing a definition of domestic abuse.

> "[D]omestic abuse" means an act that:
>
> (1) constitutes a violation of section[s] 609.221 [assault in the first degree], 609.222 [assault in the second degree], 609.223 [assault in the third degree], 609.224 [assault in the fifth degree], 609.342 [criminal sexual conduct in the first degree], 609.343 [criminal sexual conduct in the second degree], 609.344 [criminal sexual conduct in the third degree], 609.345 [criminal sexual conduct in the fourth degree], 609.713 [terroristic threats], * * *; and
>
> (2) is committed against the victim who is a family or household member as defined in section 518B.01, subdivision 2, paragraph (b).

Minn.Stat. § 609.185(6) (1994).

Minn.Stat. § 518B.01, subd. 2(b) (1994) in turn defines "family or household members" to mean:

> spouses, former spouses, parents and children, persons related by blood, and persons who are presently residing together or who have resided together in the past,

---

**7.** A Washington court recently upheld a similar statute in the face of a "void for vagueness" challenge based on the absence of a definition of the word "pattern." *See State v. Russell,* 69 Wash.App. 237, 848 P.2d 743 (1993).

and persons who have a child in common regardless of whether they have been married or have lived together at any time * * * [and] a man and woman if the woman is pregnant and the man is alleged to be the father, * * *.

Thus, contrary to Robinson's position, the "pattern" of activity which is an element of domestic abuse murder is carefully limited to a small number of criminal acts and a narrow group of victims. The central "organizing principle" is the existence of a domestic relationship itself and the "distinguishing characteristics" are the involvement of the same participants—victim and perpetrator—and the same types of crimes. Other types of crimes committed against the family or household member, e.g., theft, may not be included within the pattern, and assaults otherwise within the definition of "domestic abuse" are excluded if committed against an unrelated person.[8]

This is a far greater degree of certainty as to what constitutes the prohibited behavior than may be encompassed by the definition of "pattern" within the federal RICO statute, a definition which has been found to be constitutional in a number of cases. See H.J. Inc., 492 U.S. at 238, 109 S.Ct. at 2900; Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. No constitutional infirmity arises from the absence of a specific definition of "pattern" in the domestic abuse murder statute.

Next we consider whether the state proved beyond a reasonable doubt that Robinson was guilty of domestic abuse murder. Robinson admits hitting, grabbing and restraining Smith, but argues that his own admission and other evidence of these incidents is insufficient to establish guilt. He asserts that these incidents, even if they could be considered acts of domestic abuse, were only isolated incidents and thus could not prove beyond a reasonable doubt that the killing was committed as part of a "pattern."

■ When considering the sufficiency of the evidence, this court must view the evidence in the record in the light most favorable to the jury's verdict and must assume the jury believed the state's witnesses and disbelieved contrary evidence. State v. Braylock, 501 N.W.2d 625, 628 (Minn.1993). This court reviews that evidence and the legitimate inferences drawn from it to determine if they were sufficient to permit the jury, giving due regard for the presumption of innocence, to reasonably conclude the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted. State v. Moore, 481 N.W.2d 355, 360 (Minn.1992).

As noted above, the state relied on testimony and evidence of specific incidents of past abuse. Furthermore, in his statement to the police, Robinson admitted to prior fights, stating that, "We must have been through five or six fights there [the house in which Robinson and Smith previously lived]. This isn't our first," and when asked how many physical fights there had been during the relationship he answered, "Ten, at least." Additionally, at trial Robinson admitted to the October 1990 "fist fight" and at least three other incidents of "grabbing" or "shaking" Smith. We conclude, as we did in State v. Grube, 531 N.W.2d 484 (Minn.1995), that given any reasonable definition of the word "pattern", the evidence taken in the light most favorable to the verdict was sufficient to allow the jury to conclude that Robinson was guilty of domestic abuse murder.

■ Next we consider Robinson's argument that his conviction for second-degree intentional murder must be reversed because the state failed to prove beyond a reasonable doubt that he did not act in the heat of passion. The law is well-established that due process requires the state to prove beyond a reasonable doubt the existence of every element of the crime charged. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970); State v. Clausen, 493 N.W.2d 113, 116 (Minn.1992). Once a defendant raises a claim of heat of passion, the

---

8. We also note that some literature describes the identifying characteristics of the abusive domestic relationship, such as controlling behaviors, along with jealousy and possessiveness. See, e.g., David Adams, "Identifying the Assaultive Husband in Court: You Be the Judge," 13 Response 13 (1990).

burden shifts to the state to prove beyond a reasonable doubt the absence of heat of passion. *See State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994); 10 Minn. Dist. Judges Ass'n., *Minnesota Practice,* CRIMJIG 11.14 (3rd ed. 1990). Applying the same standard as in the previous sufficiency of the evidence claim, we conclude that the state has met its burden on this issue as well.

Minn.Stat. § 609.20 (1994) provides:

Whoever does any of the following is guilty of manslaughter in the first degree * * *:

(1) intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances, * * *.

▮ A defendant's emotional state alone will not mitigate murder to manslaughter; rather the words and acts of a victim must have been enough to provoke a person of ordinary self-control. *State v. Cuypers,* 481 N.W.2d 553, 557 (Minn.1992). Further, this court has said that where the defense attempted to prove provocation via testimony of the defendant, that the victim was "ragging" on defendant and that was the "final straw," the jury was free to reject that testimony, and even if the testimony was credited, it could be concluded that it did not constitute sufficient provocation. *State v. Shepherd,* 477 N.W.2d 512, 515 (Minn.1991). Additionally, in an older case we stated:

To determine on the sufficiency of the provocation to mitigate the killing from murder to manslaughter, the instrument or weapon with which the homicide was effected must be taken into consideration; for if it was effected with a deadly weapon, the provocation must be great indeed to lower the grade of the crime from murder; * * *.

*State v. Shippey,* 10 Minn. 223 (Gil.178) (1865).

On direct examination Robinson testified that on the night he killed Smith they had gotten into a "heated" and "boisterous" argument, that she threw his keys at him, told him she hated him and that she would kill him. While Robinson testified that he "blacked out" and could not remember inflicting the wounds on Smith, there was also testimony that Robinson had told Smith that he was not going to let her leave and that while he walked to the kitchen to get the knife, he said, "Call the police because I'm going to go to jail tonight." Furthermore, the record provides no evidence of the kind of provocation which would be necessary to support a "heat of passion" defense, particularly where a deadly weapon was used. We conclude that the state met its burden of disproving the presence of heat of passion and that the evidence was sufficient to sustain Robinson's conviction for second-degree murder.

Finally, we turn to two evidentiary rulings which Robinson appeals: (1) the admission of autopsy and crime scene photos and (2) the exclusion of testimony regarding Smith's prior use of a knife in a domestic setting. Robinson claims the admission of the photographs violated his due process right under the Fifth and Fourteenth Amendments of the United States Constitution and his right to a fair trial under Article I, sections 6 and 7 of the Minnesota Constitution. Robinson's argument is two-fold: (1) that the trial court's ruling was erroneous due to the highly inflammatory nature of the photographs and the fact that it was not disputed that Robinson killed Smith, and (2) that the state's use of the photographs during closing argument was improper.

▮ The admission of photographs at trial is in the discretion of the trial court. *State v. Jobe,* 486 N.W.2d 407, 416 (Minn. 1992); *State v. Daniels,* 361 N.W.2d 819, 828 (Minn.1985). The standard for the admissibility of photographs was set by this court in *State v. De Zeler,* 230 Minn. 39, 41 N.W.2d 313 (1950), which held:

Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the

details of a shocking crime or incidentally tend to arouse passion or prejudice.

*De Zeler,* 230 Minn. at 46–47, 41 N.W.2d at 319. This standard has been reaffirmed in a number of cases. *See e.g., Jobe,* 486 N.W.2d at 416; *State v. Hummel,* 483 N.W.2d 68, 74 (Minn.1992).

Here the defense argued that the photographs were irrelevant and their prejudicial impact substantially outweighed any probative value. By contrast, the state contended the photos were relevant and probative to the elements of intent and extreme indifference to human life. The court evaluated individually the submitted photographs and admitted 20 of them: six show blood stains where the killing took place, two are of the knife, three show the crime scene and nine are autopsy photos.

▮ Because the state charged Robinson with first-degree premeditated murder, questions of intent and premeditation were clearly at issue. Minn.Stat. § 609.185(1) (1994). As we said in *Hummel* with regard to similar photographs, "The exhibits * * * allowed the jury to better visualize the crime scene. And the extent and type of harm to the victim is material to the issues of intent and premeditation." 483 N.W.2d at 74. Furthermore, the photographs are also relevant to establishing that the crime manifested "an extreme indifference to human life," which is an element of domestic abuse murder. Minn. Stat. § 609.185(6) (1994). While the photographs admitted here were indeed chilling evidence of a brutal crime, they are clearly relevant and are not rendered inadmissible merely by their graphic depiction of the violence inflicted on Smith. The trial court's ruling to admit crime scene and autopsy photos is affirmed.

▮ We also reject Robinson's claim that the prosecutor's reference to the photographs during closing argument was error. *See Hummel,* 483 N.W.2d at 74; *State v. Barbo,* 339 N.W.2d 905, 906 (Minn.1983). As the trial court noted in denying the defense counsel's motion for a mistrial, the photographs were exhibits, duly admitted into evidence and thus available to the jury in the jury room. *See Brabeck v. Chicago & North-*

*western Ry. Co.,* 264 Minn. 160, 168, 117 N.W.2d 921, 926 (1962); Minn.R.Crim.P. 26.03, subd. 19(1). It was not error for the prosecutor to refer to the photographs during closing argument.

▮ Robinson also contends that the trial court erred in barring testimony by Smith's sister that Smith had used a knife in an incident involving her former husband some 10 years ago. The trial court ruled that the evidence was inadmissible hearsay, that it was irrelevant as character evidence when the victim's character was not at issue in the case, and that it was too remote in time to be relevant. On appeal, Robinson relies specifically on Minn.R.Evid. 404 and 405, arguing that the testimony was relevant as evidence of "a pertinent trait of character of the victim of the crime," Minn.R.Evid. 404(a), and that such evidence of other crimes may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," Minn. R.Evid. 404(b).

Although we believe there are several bases for exclusion of the proffered evidence, we affirm the trial court on the theory that the proffered testimony was simply not relevant where the defense theory was that the crime had been committed in the heat of passion, not self-defense. The threshold determination of relevance turns on whether the evidence logically or reasonably tends to prove or disprove a material fact in issue, or tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference regarding the existence of a material fact. Minn.R.Evid. 401 advisory committee comment.

▮ Both Minn.R.Evid. 404(a)(2) and caselaw indicate that when an accused asserts self-defense and had knowledge of the prior violent acts, then evidence of the victim's violent or bad character can be relevant to show "reasonable apprehension" by the accused. *See State v. Bland,* 337 N.W.2d 378, 383 (Minn.1983). Thus, if the defense theory in this case was self-defense, admission of testimony regarding the character of the victim might be authorized by Minn. R.Evid. 404(a)(2). However, that is not the case here and we can identify no fact issue

relating to a "heat of passion" defense to which such evidence is relevant. Further, the proffered evidence does not appear to fit within the categories of possible relevance listed in Minn.R.Evid. 404(b): motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Finally, the trial court noted that the evidence to be offered on this issue was inadmissible hearsay based on rumors and speculation. It certainly did not meet the requirement of "bad acts" evidence allowed by the rule be proven by clear and convincing evidence. Minn.R.Evid 404(b). There was no abuse of discretion in the trial court's decision to exclude the proffered evidence of Smith's use of a knife on a previous occasion.

In the absence of any reversible error, we affirm Robinson's convictions.

Affirmed.