**STATE of Minnesota, Respondent,**

v.

**Johnny Jerome CLARK, Appellant.**

No. A06–1464.

Supreme Court of Minnesota.

Oct. 4, 2007.

Rochelle R. Winn, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, James C. Backstrom, Dakota County Attorney, Shirley A. Leko, Asst.

Dakota County Attorney, Hastings, MN, for Respondent.

## OPINION

MEYER, Justice.

A Dakota County jury found appellant Johnny Jerome Clark guilty of first-degree premeditated murder and first-degree domestic abuse murder for the shooting death of his long-time girlfriend, P.M. The court convicted Clark of first-degree domestic abuse murder and sentenced him to life in prison. At trial, Clark admitted shooting P.M., but the defense argued that the murder was not premeditated. In this direct appeal, Clark claims that the evidence is insufficient to convict him of first-degree domestic abuse murder and first-degree premeditated murder.

On May 14, 2005, at 2:05 a.m. Clark entered the Hennepin County jail, approached an officer, and said, "Put me in prison. I hurt my baby." After Clark explained that he had hurt his girlfriend, P.M., who lived in Burnsville, the officer relayed the information to the Burnsville police, who went to P.M.'s apartment. The police entered the secure building and found P.M.'s apartment door unlocked. After entering the apartment, they found P.M. lying in a pool of blood on the bathroom floor, unconscious and not breathing. There was an open cell phone lying on the floor near her hand. P.M. was transported to an ambulance, where she was pronounced dead.

The cause of P.M.'s death was fatal gunshot wounds to the head and the back. The gunshot wound to the back was a contact wound, meaning that the muzzle of the gun was held in very close proximity to the surface of her body. The bullet entered the right side of P.M.'s back, passed through both lungs, the aorta, and two chambers of the heart, and exited at the side of the left breast. The medical examiner testified that the exit wound on P.M.'s body and damage to the bathroom floor were consistent with shooting P.M. in the back while she was lying on the bathroom floor. The bullet that caused the head wound came from a gun that was at least two feet away when it was fired.

Clark and P.M., though not married, had been together as a couple for about 16 years. They had three children together, L.C., S.B.C.,[1] and D.C., who at the time of Clark's trial were 16, 14, and 13 years of age, respectively. At the end of 2004, the relationship between P.M. and Clark became strained, and P.M. wanted Clark to move out of the apartment they shared. In April 2005, Clark discovered that P.M. was pursuing a romantic relationship with N.A., the cousin of P.M.'s good friend, A.P.

N.A. and P.M. communicated frequently by phone and e-mail. P.M. went to New York to visit N.A. over Valentine's Day 2005. Sometime in April of 2005, Clark left a message for N.A., which N.A. played for his cousin A.P. A.P. testified that on the message it sounded as if Clark was choking P.M.

Clark claimed that he was not angry about the relationship between P.M. and N.A., because he believed that P.M. and N.A. were just friends. However, L.C. testified that sometime before the murder she was watching a movie with Clark about a woman cheating on her husband. L.C. asked Clark why the husband would

---

1. The middle child will be referred to as S.B.C. to avoid confusion with Clark's cousin S.C.

kill the man instead of his wife, and Clark replied, "So you think I should kill your mom?" When L.C. asked why, Clark said it was because P.M. was cheating on him.

On April 28, 2005, P.M. called the police to the family's Burnsville apartment and told them that she and Clark were having an argument over some property in the apartment and she wanted him to leave. Clark claimed that the fight was over a laptop computer that he had purchased for P.M. and wanted to take with him when he moved out. D.C. testified that Clark and P.M. were arguing in the master bedroom before P.M. and S.B.C. went to the main office of the apartment complex to call the police. D.C. testified that before the police arrived, Clark drove P.M.'s truck over her cell phone, which Clark testified N.A. had given her. The responding police officer testified that he suspected no physical violence and that he gave Clark a ride to a bus stop. P.M. and her children went to the home of A.P. and spent the night, something they had never done before. According to A.P., this altercation between P.M. and Clark occurred the day after A.P. heard the phone message that Clark had left for N.A.

A.P. testified that when P.M. and the children came to her home on April 28, P.M. was very distraught and emotional, saying she wanted to leave the state. P.M. told A.P. that she and Clark were fighting and that Clark had taken out a gun. P.M. had a cut on her face, but claimed that she had cut herself. P.M. stayed away from the apartment for about a week, and Clark did not know where she was. P.M. had the locks changed on the apartment before she and the children moved back in. By the time P.M. and the children moved back into the apartment, Clark had moved his things out and was no longer living there. He had accessed the apartment to remove his things with a key given to him by P.M.

Clark and his cousin, S.C., grew up together and had a close relationship. S.C. also had a close relationship with P.M. and sometimes spent time with her when Clark was not around. On the night of May 13, 2005, P.M. called S.C. about going out with P.M. P.M. arrived at S.C.'s home around 11 or 11:30 p.m. and made a few phone calls. P.M. talked to her sister around 11 p.m., but since it was late, they decided not to go out. P.M. left S.C.'s home sometime between 11:30 p.m. and midnight. At 11:56 that evening P.M. left a voice mail message for her sister.

Clark testified that he went to P.M.'s apartment shortly after midnight on May 14 because he and P.M. planned to get something to eat and talk. He said he entered the secure apartment building using a key he had from when he lived there and then knocked on P.M.'s apartment door. According to Clark, P.M. let him into the apartment, greeted him with a hug, and they went toward the master bedroom; she went toward the closet and he went into the bathroom. Clark asked P.M. what happened with her and N.A. P.M. told Clark that it was over and that Clark was worried about the wrong thing. Clark replied, "I'm not worried about nothing, whatever, what you do, who you f* * *." P.M. replied, "you don't give a f* * *, that's why I'm f* * *ing [S.C.]," referring to Clark's cousin. Clark testified that he then shot P.M. and fled.

Clark testified he drove back to his mother's house and from there got a ride to a house near the Mall of America, where he met S.C. Clark told S.C. that he may have hurt P.M. badly and that he wanted to turn himself in at the jail. S.C. said that Clark was crying so hard that it was difficult to understand him. S.C. drove Clark to the jail in downtown Minne-

apolis, Clark hugged S.C., gave S.C. Clark's cell phone, and went inside. Later, S.C. found a duffel bag, some papers, and a gun that did not belong to him in the back seat of his car. S.C. threw the bag and the papers in a dumpster and put the gun in the trunk of his car. After being contacted by the police, S.C. gave them the gun and Clark's phone and admitted to throwing the duffel bag and papers in a dumpster.

A black duffel bag retrieved from the dumpster had P.M.'s address on it and contained four Polaroid photos of P.M., metal handcuffs that matched keys found on Clark when he was arrested, 100 feet of rope, a bottle of acidic toilet bowl cleaner, two sealed plastic containers of battery acid with labels that read "Poison Causes Severe Burns," a new pair of heavy-duty chemical-resistant latex gloves, a safety kit that included a mask and goggles, a box of 9mm Luger cartridges with five missing, a cell phone bill in the name of Johnny Clark, a print-out of e-mail messages in which N.A. tells P.M. that he loves her, dated April 22 and 23, 2005, a cell phone bill with N.A.'s name and P.M.'s address, the back side of an empty CD case, a black marker, and a bottle of liquor.

The defense theory was that Clark did not premeditate the murder, but that he went into a rage and shot P.M. upon hearing that she was sleeping with S.C., Clark's cousin. Clark claimed that he often carried a gun for protection. Clark stated that he went to P.M.'s apartment to talk to her. He testified that he did not bring the duffel bag to her apartment, but rather took it from his mother's house after he killed P.M. because he thought it contained drugs and he did not want the police to find it if they came to his mother's house. Clark also claimed that the duffel bag simply contained items he had packed while moving out of the apartment he shared with P.M.

For the purpose of proving a past pattern of domestic abuse at trial, the State introduced the following evidence. P.M.'s sister testified that when P.M. was pregnant with her oldest child, approximately 15 years before the murder, P.M. had been talking to Clark on the back porch of her mother's home when she came into the home crying and holding her ear and said that Clark had hit her. P.M.'s sister also testified that when P.M.'s daughters both were babies, she spent the night at P.M. and Clark's apartment and woke up in the night to the sound of Clark trying to wake P.M. and then hitting her. P.M.'s sister did not see what occurred, but she heard a "smack" and heard P.M. sniffling, and she saw P.M. go into the bathroom to get tissue. P.M. then returned to the bedroom and said, "Stop." L.C., Clark's and P.M.'s 16–year–old child, testified that P.M. and Clark argued a lot and that during the last two years that the family lived together, Clark slept in the master bedroom while P.M. slept in the living room. D.C., Clark's and P.M.'s 13–year–old child, testified that there was a time "this last year" when he was sleeping and he woke up to sounds. He saw Clark kicking P.M., who was on the floor in the hallway. P.M. later got dressed and went to work. In its closing, the State also argued that the jury could infer an incident of domestic abuse from the fact that P.M. called the police to the apartment after she and Clark had been arguing in the bedroom and that she then left the apartment and had the locks changed.

■■■ Clark claims the evidence is insufficient to convict him of first-degree premeditated murder and first-degree domestic abuse murder.

When reviewing the sufficiency of evidence, we view the evidence in the light

most favorable to the State and will assume that the jury believed the State's witnesses and disbelieved contrary evidence. The question on review is whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted. * * * [T]he jury is in the best position to weigh the credibility of evidence and thus determines which witnesses to believe and how much weight to give to their testimony.

*State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992) (internal citations omitted).

### I.

■ We turn first to Clark's claim that the evidence was insufficient to convict him of domestic abuse murder. Clark specifically claims that the State failed to prove beyond a reasonable doubt the existence of a past pattern of domestic abuse. Minnesota Statutes § 609.185(a)(6) (2006) provides that whoever "causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life" is guilty of first-degree murder. Domestic abuse is defined as an act that constitutes first-, second-, third-, or fifth-degree assault, domestic assault,[2] first- through fourth-degree criminal sexual conduct, or terroristic

threats,[3] and "is committed against the victim who is a family or household member as defined in section 518B.01, subdivision 2, paragraph (b)." Minn.Stat. § 609.185(c) (2006). "Family or household members" include persons "who are presently residing together or who have resided together in the past; * * * persons who have a child in common * * *; and * * * persons involved in a significant romantic or sexual relationship." Minn.Stat. § 518B.01, subd. 2(b)(4)-(6) (2006).

The state has the burden of proving a past pattern of domestic abuse beyond a reasonable doubt, but it need not prove each act constituting that pattern beyond a reasonable doubt. * * * The statute does not require proof of a pattern of domestic abuse *convictions*, or specify a minimum number of incidents which must be proven in order to find a pattern. However, a lone act of domestic abuse cannot constitute a pattern.

In order to determine whether a reasonable jury could have found a past pattern of domestic abuse, it is necessary to carefully examine the evidence presented regarding the abuse and the nature of appellant and victim's relationship as a whole.

*State v. Sanchez–Diaz*, 683 N.W.2d 824, 832 (Minn.2004) (internal citations and quotation marks omitted).

The domestic abuse murder statute does not define "past pattern," nor does it dictate a time frame within which the acts that constitute the pattern must occur.

---

2. For an act to constitute "domestic abuse" under the assault statutes or the domestic assault statute, the defendant must, at a minimum, "(1) commit[ ] an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflict[ ] or attempt[ ] to inflict bodily harm upon another." Minn.Stat. §§ 609.224, subd. 1, 609.2242, subd. 1 (2006).

3. "Whoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another * * * or in a reckless disregard of the risk of causing such terror" is guilty of terroristic threats. Minn.Stat. § 609.713, subd. 1 (2006).

*See* Minn.Stat. § 609.185(a)(6) (2006). We have noted that "a 'pattern' must involve some number of events which bear sufficient relationship to establish a similarity or principle around which they are organized." *State v. Cross,* 577 N.W.2d 721, 727 n. 3 (Minn.1998). In the context of domestic abuse, a pattern "suggests a regular way of acting by committing acts of domestic abuse." *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995). We concluded in *Robinson* that the past-pattern-of-domestic-abuse element involved both a central organizing principle, the existence of a domestic relationship, and distinguishing characteristics, the involvement of the same participants and the same types of crimes. *Id.* at 238. We noted also that domestic abuse crimes characteristically involve controlling behaviors along with jealousy and possessiveness. *Id.* at 238 n. 8. We have declined to add a specific temporal limitation as to when the separate acts of domestic abuse must have occurred to constitute a pattern, but we have held that "the events must be sufficiently proximate in time to constitute a 'pattern.'" *Cross,* 577 N.W.2d at 727 n. 3.

In *Sanchez–Diaz,* the appellant was convicted of first-degree domestic abuse murder for stabbing his live-in girlfriend with whom he had been in a relationship for about two years. 683 N.W.2d at 826–27. In determining whether the evidence of a past pattern of domestic abuse was sufficient, we relied on the following incidents: the appellant admitted, and multiple family members testified, that appellant had choked the victim sometime after March of 2001; the appellant admitted that he had slapped the victim on two or three occasions before the night of the murder; and the appellant admitted he slapped the victim on the night of the murder. *Id.* at 832–33. In concluding that the evidence of a past pattern was sufficient, we placed significant weight on appellant's statement

that the victim was afraid of him. *Id.* at 833. We also emphasized the fact that when asked whether neighbors would tell the authorities about his hitting the victim, he responded, "everybody knew how we lived." *Id.* at 832–33. This response "ma[de] it clear that the abuse appellant admitted was part of the regular way in which he related to the victim." *Id.* at 833. In affirming appellant's conviction for first-degree domestic abuse murder, we stated:

> We recognize that the facts of this case do not demonstrate a past pattern of abuse as clearly as the facts of our past decisions. However, the choking and multiple slapping incidents, considered together with the evidence of the pervasive nature of the abuse in the relationship, are adequate to demonstrate a past pattern of abuse.

*Id.* (internal citations omitted).

In this case, the State relies on five separate incidents to prove a past pattern of domestic abuse: (1) the testimony of P.M.'s sister that while P.M. was pregnant with her first child Clark hit her ("the hitting incident"); (2) the testimony of P.M.'s sister that when L.C. and S.B.C. were babies, Clark "smacked" P.M. ("the smacking incident"); (3) D.C.'s testimony that Clark kicked P.M. sometime in the year before her murder ("the kicking incident"); (4) A.P.'s testimony that she heard a phone message in which it sounded like Clark was choking P.M. ("the phone message"); and (5) A.P.'s testimony that on the day P.M. called the police to her apartment, P.M. had a cut on her face and told A.P. that Clark had taken out a gun when Clark and P.M. were arguing ("the gun incident").

■ Clark concedes that D.C.'s testimony regarding the kicking incident may be sufficient to prove one underlying act of

domestic abuse. But he argues that P.M.'s sister's testimony regarding the smacking incident is too speculative to support a finding of domestic abuse. He also argues that P.M.'s sister's testimony regarding the hitting incident is insufficient to support a finding of domestic abuse, because she did not witness the incident or testify that P.M. related any facts about the incident to her.

■ We have not always required that witnesses *see* an incident of domestic abuse for their testimony to support a pattern of domestic abuse. *See Robinson,* 539 N.W.2d at 234 (noting that the State proved one instance of domestic abuse through the testimony of the victim's children that they heard the appellant and the victim fighting and they could hear crashing and slamming against the wall). In this case, Clark and P.M. were alone in a room, and the witness clearly heard a "smack," saw P.M. go into the bathroom for tissues, heard her sniffling, and then heard her say, "Stop." On these facts, we conclude that the jury could reasonably have inferred that Clark "smacked" P.M. when they were alone together and that this smacking incident constitutes an underlying incident of domestic abuse. The same inference of domestic abuse may be drawn from the hitting incident, because P.M.'s sister testified that P.M. came into her mother's home from the back porch crying and holding her ear and saying that Clark had hit her.

■ The State argues that the phone message permits a finding of an underlying incident of domestic abuse. P.M.'s good friend, A.P., testified that sometime in April of 2005 Clark left a recorded phone message for N.A., the man with whom P.M. was having a relationship. A.P. listened to the message and testified that Clark said "this is Johnny, [P.M.'s] baby daddy * * * and I know you and [P.M.] have a relationship and I know that * * * she's a good girl, and I wish you guys the best. And I didn't treat her the best but, you know, I wish you guys the best." A.P. testified that at the end of the message Clark didn't hang up the phone and "[i]t sounded like there was a dispute in the back, as if he attacked [P.M.], * * * like he snatched her up like he'd choked her * * *." A.P. also indicated that it sounded like P.M. wanted to say something. When A.P. asked P.M. about the message, P.M. said that Clark was screaming and crying, but that he did not touch her. On these facts, we cannot conclude that the phone message incident adequately establishes an underlying incident of domestic abuse.

■ Lastly, the State claims that A.P.'s account of the gun incident is sufficient to establish an underlying incident of domestic abuse. According to A.P., the day after she heard the phone message P.M. came to A.P.'s home in a distraught state. P.M. told A.P. that she and Clark were arguing and he took out a gun. P.M. then stayed away from the apartment for about a week, and Clark did not know where she was staying. P.M. had the locks changed on the apartment.

The question is whether these facts and the legitimate inferences drawn from them would permit a jury to reasonably conclude that Clark committed an act of domestic abuse. While there is no direct evidence that Clark specifically threatened P.M. with the gun, we conclude that the jury could reasonably infer that Clark intended to frighten P.M. when he took out a gun during their argument on April 28, 2005, and therefore we conclude that the gun incident would constitute domestic abuse under either the assault or terroristic threats statutes.

■ We now turn to the question of whether the two incidents of domestic abuse that occurred 13–15 years before the murder and the two incidents of domestic abuse that occurred in the year before the murder may together establish, beyond a reasonable doubt, a past pattern of domestic abuse. While we have declined to add a specific temporal requirement to the separate acts of domestic abuse, we have held that "the events must be sufficiently proximate in time to constitute a 'pattern.'" *Cross*, 577 N.W.2d at 727 n. 3. We have also held that a pattern "suggests a regular way of acting by committing acts of domestic abuse." *Robinson*, 539 N.W.2d at 237. In other words, some incidents are too distant in time from each other to constitute a pattern or a regular way of acting.

Clark and his victim had been domestic partners and had resided together for 16 years. There is competent evidence of two incidents of domestic abuse in the early years of the relationship. After a period of living together for approximately 13 years, there is evidence of two more incidents of domestic abuse. We conclude that the acts from early in the relationship may not be considered part of a pattern of domestic abuse because those acts are too remote in time to be considered part of a "regular way of acting" for Clark. Because two of the incidents of domestic abuse occurred 13–15 years before the two incidents that occurred in the year before the murder, we conclude that the earlier incidents are not sufficiently proximate in time to the later incidents to establish a past pattern of domestic abuse.

■ We are therefore left to consider whether the two most recent incidents are sufficient to support a pattern of domestic abuse. While D.C.'s testimony that he saw Clark kicking P.M. is direct evidence of an incident of domestic abuse, A.P.'s testimony that P.M. told her that Clark took out a gun while they were arguing is circumstantial evidence of an incident of domestic abuse.[4] Thus, in order to affirm Clark's conviction for domestic abuse murder, we would have to conclude that direct evidence of one incident of domestic abuse and circumstantial evidence of a second incident of domestic abuse are sufficient to prove beyond a reasonable doubt a past pattern of domestic abuse.

The record in *Sanchez–Diaz* contained direct evidence of at least three incidents of domestic abuse in the two years before the victim's death. 683 N.W.2d at 832. In addition, the defendant admitted that the victim was afraid of him and that "everybody knew how [they] lived." *Id.* at 832–33. In *Sanchez–Diaz*, witnesses saw the defendant choking the victim, the defendant admitted to family members that he had hit the victim, and the defendant admitted that he had choked or slapped the victim at least three times during their three-year relationship. *Id.* at 832. We noted that the number of domestic abuse incidents in *Sanchez–Diaz* did not demonstrate a past pattern of abuse as clearly as the incidents involved in several past decisions. *Id.* at 833. But we thought it significant that there was other evidence that the abuse was pervasive in that the victim feared the defendant and the defendant admitted that the relationship was abusive. *Id.* at 832–33. There is no simi-

4. " 'Direct evidence' is '[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.' * * * 'Circumstantial evidence' is defined as '[e]vidence based on inference and not on personal knowledge or observation' and '[a]ll evidence that is not given by eyewitness testimony.' " *Bernhardt v. State*, 684 N.W.2d 465, 477 n. 11 (quoting Black's Law Dictionary 595–96 (8th ed.2004)).

lar evidence in this case that ties together the kicking incident and the gun incident in a way that indicates that domestic abuse was "a regular way of acting" for Clark. Therefore, we conclude that the evidence in this case is insufficient to prove that Clark engaged in a past pattern of domestic abuse. We vacate Clark's conviction for domestic abuse murder.

## II.

■■■ We turn next to the question of whether there is sufficient evidence from which the jury could have reasonably concluded that Clark was guilty beyond a reasonable doubt of premeditated murder. To be guilty of first-degree premeditated murder, Clark must have caused P.M.'s death with premeditation and intent to effect her death or the death of another. Minn.Stat. § 609.185(a)(1) (2006). Premeditation is defined as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2006). "Premeditation * * * requires some amount of time to pass between formation of the intent and the carrying out of the act." *Moore*, 481 N.W.2d at 360. However, it "does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997).

■■■ "Because intent and premeditation are states of mind, they are generally proved circumstantially—by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." *Id.* at 179.

On the basis of events before and at the time of the killing, the trier of fact will sometimes be entitled to infer that the defendant actually premeditated and deliberated his intentional killing. Three categories of evidence are important for this purpose: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*Moore*, 481 N.W.2d at 361 (quoting W. LaFave & A. Scott, *Handbook on Criminal Law* § 73, at 564–65 (1972)). "[T]he evidence as a whole may support a finding of premeditation even if no single piece of evidence standing alone would be sufficient." *Id.* In that case, "the circumstances [must] lead so directly to a finding of premeditation as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt of premeditated murder." *Id.*

### Planning activity

■■■ We have recognized evidence of planning activity to include the defendant's prior possession of the murder weapon and surreptitious approach to the victim. *See, e.g., State v. Quick*, 659 N.W.2d 701, 711–12 (Minn.2003) (bringing loaded rifle to estranged wife's house, driving around the block so as not to be seen by the neighbor, and taking off shoes to walk up stairs supported inference of premeditation); *State v. Voorhees*, 596 N.W.2d 241, 247–48, 253 (Minn.1999) (bringing rifle to estranged wife's place of work, parking a street away, and waiting in the dark for her to come outside supported inference of premeditation); *Moore*, 481 N.W.2d at 361–62 (removing shotgun from normal storage under the bed, loading it, and plac-

ing it on the shelf in the living room early on the day of the killing showed planning).

Clark went to P.M.'s apartment late at night and brought the murder weapon with him, which is strong evidence of planning activity. In addition, after the murder, Clark left in S.C.'s car a bag containing items that could have been used to restrain and torture P.M. While Clark denied having the bag at P.M.'s apartment, the jury could have reasonably inferred that Clark did have the bag, lending further support to the inference that Clark planned to harm P.M. when he went to her apartment.

### Motive

▆ Evidence of motive "includes prior threats by the defendant, plans or desires of the defendant that would have been advanced by the victim's death, and prior conduct by the victim known to have angered the defendant." *Quick*, 659 N.W.2d at 710; *see, e.g., id.* at 711 (concluding the fact that the victim and defendant were in the process of divorcing and that the victim had developed a close relationship with another man, which upset the defendant, supported inference of premeditation); *State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995) (evidence that defendant's relationship with the victim had deteriorated, that defendant was angry with the victim, and that defendant had argued with the victim the night before the killing supported a determination of premeditation); *State v. Shepherd*, 477 N.W.2d 512, 515 (Minn.1991) (noting that jury could have reasonably credited evidence of defendant's previous statements about wanting to kill the victim).

There is ample evidence that Clark and P.M. had a long-term relationship that, in the months before the murder, had begun to deteriorate. Clark knew that P.M. was pursuing a relationship with N.A., and an e-mail from N.A. telling P.M. that he loved her was in the duffel bag that Clark was carrying the night of the murder. Before the murder Clark had asked his daughter whether he should kill P.M. because she was cheating on him. The jury could have reasonably inferred from these facts that Clark premeditated P.M.'s murder because he was angry about the end of their relationship and about P.M.'s relationship with N.A.

### Nature of the killing

▆ Evidence in this category includes the manner of the killing, "such as evidence that the wounds were deliberately placed at vital areas of the body." *Quick*, 659 N.W.2d at 711; *see, e.g., Lodermeier*, 539 N.W.2d at 398 (concluding that where two of the three shots inflicted fatal wounds and both fatal wounds resulted from the gun having been fired at close range, the facts supported an inference of premeditation); *Cooper*, 561 N.W.2d at 179 (concluding that the jury could infer premeditation from the fact that multiple shots were fired, with the fatal shot coming while the victim was down).

Clark shot P.M. once in the head and once in the back, both shots inflicting fatal wounds. The evidence indicated that Clark shot P.M. in the back after she was already lying on the floor. From the evidence of deliberately placed gunshot wounds and the evidence that Clark shot P.M. while she was lying on the floor, the jury could reasonably infer that Clark premeditated the murder of P.M. In sum, the nature of the killing, the planning activity, and evidence of a motive to kill support the jury's conclusion that Clark was guilty of first-degree premeditated murder.

When a defendant's conduct constitutes more than one offense, he may be convicted and sentenced for only one of those offenses. Minn.Stat. § 609.035, subd. 1 (2006). The jury found Clark guilty of

both first-degree domestic abuse murder and first-degree premeditated murder, and the court convicted and sentenced him for the domestic abuse murder. Because we vacate Clark's conviction for domestic abuse murder, we remand for conviction and sentencing on the first-degree premeditated murder verdict. *See State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn. 1984) ("If the adjudicated conviction is later vacated * * *, one of the remaining unadjudicated convictions can then be formally adjudicated and sentence imposed, with credit * * * given for time already served on the vacated sentence.").

Affirmed in part, reversed in part, and remanded.