STATE OF MINNESOTA

IN SUPREME COURT

A24-0861

Ramsey County                                                          Hennesy, J.

State of Minnesota,

            Respondent,

vs.                                                          Filed: August 20, 2025
                                                             Office of Appellate Courts
Melvin Bilbro,

            Appellant.

--------

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Anna R. Light, Assistant County Attorney, Saint Paul, Minnesota, for respondent.

--------

S Y L L A B U S

1.      The evidence at trial was sufficient to support a guilty verdict for first-degree domestic-abuse murder under Minn. Stat. § 609.185(a)(6) (2024).

1

2.       The Sixth Amendment right to a jury under *Blakely v. Washington*, 542 U.S. 296 (2004), does not apply to the threshold question of whether a sentence may be imposed for an offense under Minn. Stat. § 609.035 (2024).

Affirmed.

O P I N I O N

HENNESY, Justice.

On August 25, 2022, Melvin Bilbro killed Shanna Daniels in her North Saint Paul apartment and set the apartment on fire.[1]  The State brought multiple charges against Bilbro, who waived his right to a jury trial on the issue of guilt but noted that he did not intend to waive a jury as to "the existence of facts to support an aggravated sentence." Following a bench trial, the district court found Bilbro guilty of first-degree domestic-abuse murder and arson.  The court sentenced Bilbro to life in prison for first-degree domestic-abuse murder and, under Minn. Stat. § 609.035, subd. 4 (2024), to a consecutive 57 months in prison for arson.  Minnesota Statutes section 609.035, subdivision 4, provides an exception to the general rule that a district court may not sentence a defendant for multiple offenses arising out of a single behavioral incident.  The exception allows a district court to sentence a defendant for multiple offenses arising out of the same incident where one of the offenses is arson and the defendant is shown to have committed that arson for the purpose of concealing another crime.  Because the district court found that Bilbro

---

[1]       Bilbro does not contest that he killed Daniels; he argues that Daniels's murder does not rise to the level of first-degree domestic-abuse murder.

committed arson for the purpose of concealing a crime, the court imposed the consecutive sentence.

In this direct appeal, Bilbro argues the State did not meet its burden of proving him guilty of first-degree domestic-abuse murder because the State failed to prove two elements of that offense: that he was in a significant romantic or sexual relationship with Daniels and that he engaged in a past pattern of domestic abuse. Bilbro also claims that the district court violated his Sixth Amendment right to a sentencing jury when the court, rather than a jury, made a factual finding that he committed arson for the purpose of concealing Daniels's murder and sentenced him for arson based on that determination.

We conclude that the State proved all the elements of first-degree domestic-abuse murder beyond a reasonable doubt. We also hold that the Sixth Amendment right to a jury under *Blakely v. Washington*, 542 U.S. 296 (2004), does not apply to a district court's finding of fact authorizing imposition of a sentence under Minn. Stat. § 609.035, subd. 4. Accordingly, we affirm.

**FACTS**

In the spring of 2021, appellant Melvin Bilbro moved into an apartment in North Saint Paul. Shanna Daniels lived in a neighboring apartment building. Bilbro and Daniels began a romantic relationship. At trial, the State established details of their relationship primarily through evidence of their shared text messages. On July 9, 2022, Bilbro

3

introduced himself to Daniels by text.[2]  Over the next six weeks, the two texted regularly, and their romantic relationship progressed quickly.  They referred to each other using terms of endearment, including "love," "Hubby," and "wifey," and said they loved each other.  Bilbro repeatedly wrote about his intention to marry Daniels.  Their texts referenced their sexual relationship and indicated that they were spending nights together.[3]  The two exchanged nude photographs.  An officer who examined Daniels's phone testified that Daniels did not communicate with anyone else "in the same way" she communicated with Bilbro.

A property manager often saw Bilbro and Daniels together and assumed they "became a couple" or were "friendly."  Bilbro's neighbor referred to Daniels as Bilbro's "girlfriend" when he spoke to police.

On August 24, 2022, Daniels's neighbor heard loud noises coming from Daniels's apartment.  According to the neighbor, it sounded like people were fighting and shoving each other.  On the evening of August 25, the fire alarm went off in Daniels's building and smoke rose from her apartment.  Dash cam video from responding police officers shows Bilbro walking away from the apartment building.

---

[2]  The record is silent as to the exact date the two met or how Bilbro obtained Daniels's phone number.  The earliest evidence of their relationship in the record is the text message Bilbro sent introducing himself.

[3]  For example, in one text message Bilbro stated: "It felt so good sleeping next to you it felt like was [sic] supposed to be that way, and seeing that gorgeous face first thing in the morning will have my day run smoothly."  In another text message, Daniels wrote, "just going in to check out my sexual health with you being a new partner . . . ."

First responders found a fire burning in Daniels's bedroom and her body on the floor at the foot of the bed. Daniels had stab wounds on her face, left eye, neck, and vaginal area. Because she had no soot in her lungs, the medical examiner concluded that she had died before the fire started. In the apartment, officers found a knife and a pair of scissors with blood on them. Investigators determined that the fire had been intentionally set and that it had originated in two different places in the bedroom—on the mattress and on Daniels's body.

Bystanders at the scene reported seeing a man in the window of Daniels's apartment at the time of the fire, with one bystander calling the man "Melo." Police identified "Melo" as the appellant, Melvin Bilbro. In Bilbro's apartment, officers found bloodstains containing both Bilbro's and Daniels's DNA on various items and surfaces. Officers also found Daniels's dog in Bilbro's apartment. The dog was locked in the bathroom and had soot on its fur.

Officers arrested Bilbro for Daniels's murder. When questioned by police, Bilbro denied any involvement. He claimed that he and Daniels were not in a relationship. When asked about the fire, Bilbro suggested that it could have been the result of a cooking accident as Daniels "likes to try to cook when she's high."

The State charged Bilbro with first-degree domestic-abuse murder, second-degree intentional murder, and first-degree arson. Bilbro waived his right to a jury trial on the issue of whether he committed these offenses, but on the written waiver form he noted that he did not intend to waive a jury as to "the existence of facts to support an aggravated sentence."

The case proceeded to a court trial. To establish the element of a past pattern of domestic abuse for the offense of first-degree domestic-abuse murder, the State called Bilbro's former girlfriend, A.B., to testify about how Bilbro treated A.B. during their relationship. A.B. testified that she met Bilbro in early 2007 and that their relationship progressed quickly. The two moved in together within 60 days of meeting. The relationship lasted less than one year. As their relationship progressed, Bilbro became jealous. He often accused A.B. of infidelity and became verbally abusive. Bilbro "made threats all the time," and eventually, his threats escalated into physical abuse. On one occasion, for which A.B. did not provide a date, Bilbro pushed A.B., causing her to fall and cut her eye on the corner of a wall. In the trial for Daniels's murder, the district court found that this prior act of domestic abuse was proven beyond a reasonable doubt.

In August 2007, Bilbro pushed A.B. again, causing her to fall, an incident for which Bilbro was convicted of gross misdemeanor domestic assault. In the present case, the district court found that A.B. testified credibly about her relationship with Bilbro and that this push was a prior act of domestic abuse proven beyond a reasonable doubt.

In February 2008, A.B. told Bilbro that she wanted to end their relationship and that she had removed him from the apartment lease. Bilbro threatened to kill her. That night, A.B. woke to Bilbro standing over her with a knife. A struggle ensued, and Bilbro hit A.B. several times with a wrought iron curtain rod. Bilbro threatened to hurt A.B.'s daughter and told A.B. that if she made another noise he was going to "cut [her] face off." A.B. screamed, and Bilbro stabbed her in the forehead. This cut the optic nerve in A.B.'s left eye, causing permanent partial blindness. Following this offense, Bilbro pled guilty to

6

attempted second-degree intentional murder, Minn. Stat. § 609.19, subd. 1 (2024), and the district court sentenced him to 163 months in prison. In the trial for Daniels's murder, the district court found that A.B. testified credibly about the night Bilbro attempted to murder her and that his actions constituted an act of domestic abuse proven beyond a reasonable doubt.

After serving nine years in prison for his conviction for attempted second-degree intentional murder, Bilbro was released in January 2017. Five-and-a-half years later, he began his relationship with Daniels.

During Bilbro's trial for the current offense, in addition to A.B.'s testimony about Bilbro's past conduct, the State presented testimony from police officers, firefighters, the medical examiner, and other witnesses that established the facts of Daniels's murder, as described above, and the nature of Bilbro and Daniels's relationship. At the conclusion of the bench trial on the murder and arson charges, the district court found Bilbro guilty on all three counts. The court sentenced Bilbro to life in prison without the possibility of release for the first-degree domestic-abuse murder conviction, as required by law. The court also found that Bilbro committed arson for the purpose of concealing Daniels's murder and sentenced him to 57 months for that offense, to be served consecutive to the murder sentence.

## ANALYSIS

We first consider whether the record evidence is sufficient to prove that Bilbro committed first-degree domestic-abuse murder. Second, we consider whether the district court's factual finding that Bilbro committed arson for the purpose of concealing a crime,

which authorized the imposition of a sentence for arson under Minn. Stat. § 609.035, subd. 4, violated his constitutional right to a sentencing jury.

## I.

"When reviewing a claim of insufficient evidence," we consider "whether the fact finder could have reasonably concluded that [the] defendant was guilty beyond a reasonable doubt." *State v. Sanchez-Diaz*, 683 N.W.2d 824, 831 (Minn. 2004) (citation omitted) (internal quotation marks omitted). In doing so, we "view[] the evidence in the light most favorable to the verdict and assume[] that the fact finder believed the state's witnesses and disbelieved any contrary evidence." *Id.* (citation omitted) (internal quotation marks omitted). "We defer to the district court when it acts as the factfinder in a court trial, because it is generally in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony." *State v. Latino*, 15 N.W.3d 654, 663 (Minn. 2025). And "[w]e use the same standard of review to evaluate the sufficiency of the evidence in bench trials and jury trials." *State v. Lopez*, 908 N.W.2d 334, 335 (Minn. 2018).

For a defendant to be convicted of first-degree domestic-abuse murder, the State must prove the defendant "cause[d] the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occur[red] under circumstances manifesting an extreme indifference to human life." Minn. Stat. § 609.185(a)(6) (2024). Bilbro argues that the State did not prove that Daniels's murder occurred while Bilbro was

8

committing domestic abuse. Bilbro also argues that the State has not shown that he engaged in a past pattern of domestic abuse. We address each argument in turn.

A.

Bilbro contends that the trial evidence was insufficient for the factfinder to conclude that he committed domestic abuse against Daniels because the evidence did not establish that he was in a significant romantic or sexual relationship with Daniels. Domestic abuse is defined as an act of assault, or another predicate offense,[4] "committed against the victim who is a family or household member . . . ." Minn. Stat. § 609.185(e) (2024). The definition of "family or household member[]" includes "persons involved in a significant romantic or sexual relationship." Minn. Stat. § 518B.01, subd. 2(b)(7) (2024). In determining whether a romantic or sexual relationship is significant, the statute directs courts to consider four factors: "the length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination." Minn. Stat. § 518B.01, subd. 2(b) (2024). Based on these factors, we conclude that the evidence was sufficient to prove that Bilbro and Daniels were involved in a significant romantic or sexual relationship.

Although Daniels's relationship with Bilbro started only 47 days before her death,[5] other factors strongly support the conclusion that the relationship was significant. The

---

[4] Other possible predicate acts include criminal sexual conduct or threats of violence, but those are not relevant here. *See* Minn. Stat. § 609.185(e) (2024).

[5] This is measured from the day Bilbro introduced himself by text to the day Daniels was murdered.

9

relationship became intimate and sexual quickly. The two interacted frequently over text, wrote that they loved each other, and gave each other pet names. Daniels and Bilbro discussed marriage, shared nude photos, and referenced their sexual relationship. They were seen together often enough that the property manager and Bilbro's neighbor assumed they were dating. Viewing the facts in the light most favorable to the verdict, the evidence was sufficient to prove that Bilbro and Daniels were in a significant romantic or sexual relationship. Thus, when Bilbro murdered Daniels, he did so while committing domestic abuse.

B.

Bilbro's other argument challenging the sufficiency of the evidence supporting his first-degree domestic-abuse murder conviction is that the State did not prove that he had engaged in a past pattern of domestic abuse. The term "past pattern" is not defined in statute. *See* Minn. Stat. § 609.185. We have interpreted "past pattern" to require more than one past incident of domestic abuse. *State v. Johnson*, 773 N.W.2d 81, 86 (Minn. 2009) (quoting *State v. Grube*, 531 N.W.2d 484, 491 (Minn. 1995) ("[A] lone prior act 'does not and cannot constitute a pattern.' ")). The State must prove that the past abuse constituted a pattern—"a regular way of acting"—for the defendant. *Johnson*, 773 N.W.2d at 86 (citation omitted) (internal quotation marks omitted). Establishing a past pattern requires at least two prior acts of domestic abuse, but two prior acts may not always be sufficient. *State v. Hayes*, 831 N.W.2d 546, 554 (Minn. 2013). Prior "acts that are not sufficiently proximate in time do not constitute" a regular way of acting and do not establish a past pattern. *Id.*

10

Bilbro argues the State failed to prove that he engaged in a past pattern of abuse because it proved only one incident of past domestic abuse—his conviction for gross misdemeanor domestic assault for pushing A.B.—beyond a reasonable doubt. According to Bilbro, A.B.'s testimony that Bilbro pushed her on another occasion, causing her to fall and cut her eye, was too vague to prove the incident beyond a reasonable doubt. He also argues that his attempted murder of A.B. cannot constitute an act of domestic abuse because attempted murder is not listed as an offense constituting domestic abuse in the statutory definition. In the alternative, Bilbro argues that even if multiple prior acts of domestic abuse were proven, his acts of domestic abuse were not close enough in time to establish a past pattern. The State responds that Bilbro's attempted murder of A.B. is a prior incident of domestic abuse and that Bilbro's acts of domestic abuse against A.B. were sufficiently proximate in time to constitute a past pattern.

Domestic abuse is an act committed against a family or household member that also constitutes one of the enumerated crimes of assault, domestic assault, criminal sexual conduct, or threats of violence. Minn. Stat. § 609.185(e). A conviction is not required to establish an act of domestic abuse. *State v. Cross*, 577 N.W.2d 721, 727 (Minn. 1998); *see also Gulbertson v. State*, 843 N.W.2d 240, 245 (Minn. 2014) (concluding that there was sufficient evidence to show a past pattern of domestic abuse where the State introduced evidence that the defendant threatened, pushed, and injured a victim but was not convicted of any crimes based on these acts). The inquiry under Minn. Stat. § 609.185(e) is whether a defendant's past *acts* constitute any of the enumerated offenses, not whether the defendant was previously *convicted of a crime* for those past acts. *See Cross*, 577 N.W.2d at 727. As

11

we have previously held, a single witness's testimony may be sufficient to prove a crime beyond a reasonable doubt, even without corroborating evidence, when that witness is credible. *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004).

The district court found that A.B. testified credibly about the instance when Bilbro pushed her, causing her to fall into the corner of a wall and cut her eye, and that this testimony proved a prior act of domestic abuse—domestic assault—beyond a reasonable doubt. A person commits domestic assault when that person "intentionally inflicts or attempts to inflict bodily harm upon" a family or household member. Minn. Stat. § 609.2242 (2024). Bilbro argues that A.B.'s testimony failed to establish his intent. But "the fact-finder may infer that a person intends the natural and probable consequences of that person's actions." *State v. Colgrove*, 996 N.W.2d 145, 152 (Minn. 2023). A.B. testified that Bilbro pushed her into a wall hard enough that the impact cut her eye. It is reasonable to infer that the natural and probable consequence of pushing someone into a wall is bodily harm. This evidence, viewed in the light most favorable to the verdict, was sufficient to prove beyond a reasonable doubt that Bilbro intentionally inflicted bodily harm upon A.B.

Evidence also established beyond a reasonable doubt that the act underlying Bilbro's attempted murder conviction satisfied the elements of first-degree assault, which is an enumerated offense constituting domestic abuse. A person commits assault in the first degree when they assault another and inflict great bodily harm. Minn. Stat. § 609.221, subd. 1 (2024). In pleading guilty to attempted second-degree intentional murder, Bilbro admitted to stabbing A.B. in the face with a knife, causing her pain and permanent loss of

12

vision. During Bilbro's trial for murdering Daniels, A.B. testified about the attempted murder incident. According to A.B., Bilbro hit her with an iron curtain rod and then stabbed her in the face with a knife, cutting her optic nerve and causing permanent partial blindness in one eye. This evidence is sufficient to establish Bilbro inflicted great bodily harm on A.B.: permanent partial loss of vision.

We are therefore satisfied that each of these acts constitutes a prior act of domestic abuse.[6] Accordingly, the evidence was sufficient to prove that Bilbro committed at least three prior acts of domestic abuse: (1) pushing A.B., which led to a gross misdemeanor domestic assault conviction; (2) pushing A.B. into a wall, cutting her eye; and (3) stabbing A.B. in the face with a knife.

We next turn to the question of whether these past *acts* of domestic abuse are sufficient to establish a past *pattern* of domestic abuse. "[A] pattern of abuse is shown with evidence that suggests the defendant's regular way of acting is by committing domestic abuse." *State v. Heller*, 12 N.W.3d 452, 463 (Minn. 2024) (citation omitted) (internal quotation marks omitted). When analyzing whether the evidence establishes a

---

[6]     The district court concluded that assault is a lesser included offense of attempted second-degree intentional murder under Minn. Stat. § 609.19. This is incorrect. *See State v. Gisege*, 561 N.W.2d 152, 156 (Minn. 1997) (stating that an offense is lesser included if the commission of the greater offense necessarily proves the lesser offense based on the statutory requirements). Because assault and second-degree murder contain distinct elements, assault is not a lesser included offense of second-degree murder. *Compare* Minn. Stat. § 609.221, subd. 1, *with* Minn. Stat. § 609.19, subd. 1(1). For reasons already stated, however, the acts constituting attempted murder against A.B. *also* constitute an assault, even though assault is not a lesser included offense of second-degree murder. Therefore, the district court's ultimate conclusion that Bilbro committed assault when he attempted to murder A.B. was correct.

past pattern of domestic abuse, we "carefully examine the evidence presented regarding the abuse and the nature of appellant and victim's relationship as a whole." *Sanchez-Diaz*, 683 N.W.2d at 832. "[A] 'pattern' must involve some number of events which bear sufficient relationship to establish a similarity or principle around which they are organized." *Cross*, 577 N.W.2d at 727 n.3. "[E]ach act of domestic abuse must be sufficiently proximate in time . . . to constitute a pattern." *Heller*, 12 N.W.3d at 464 (citation omitted) (internal quotation marks omitted). "The previous incidents [of domestic abuse] must also be proximate in time to the charged offense . . . ." *Lussier v. State*, 821 N.W.2d 581, 590 (Minn. 2012). "[W]e have declined to add a specific temporal requirement to the separate acts of domestic abuse," *State v. Clark*, 739 N.W.2d 412, 421 (Minn. 2007), thus there is no specific amount of time after which incidents are deemed too remote to be proximate. In *State v. Heller*, in a fact-intensive inquiry, we recognized that acts stretching back 20 years were evidence of a regular way of acting when the abuse was repeated consistently with gaps of not more than six or seven years. 12 N.W.3d at 464–65.

In *State v. Clark*, we considered whether four incidents of past domestic abuse constituted a regular way of acting. 739 N.W.2d at 421. Clark abused his partner on two occasions, subsequently lived with the partner for 13 years without any incidents, then abused the partner two more times in the year before murdering her. *Id.* We concluded that the two "acts from early in the relationship may not be considered part of a pattern of domestic abuse because those acts [we]re too remote in time to be considered part of a 'regular way of acting' for Clark." *Id.* Moreover, we determined that the two acts that

occurred during the year before the murder failed to establish a pattern. *Id.* at 421–22. We reasoned that the State presented only circumstantial evidence for one incident and that there was no evidence tying the two alleged incidents together to suggest that domestic abuse was a regular way of acting for Clark. *Id.*

Bilbro's three acts of abuse against A.B. occurred during their less-than-one-year-long relationship, which ended 14 years before Daniels's murder. Bilbro argues that, under *Clark*, his abuse of A.B. is too remote from Daniels's murder to be considered evidence of a regular way of acting. But this case is distinguishable from *Clark* because, while Clark lived with his victim for 13 years without any known acts of abuse, nine of Bilbro's years without any known incidents of domestic abuse were spent in prison.[7] This prison sentence interfered with his ability to engage in a "regular way of acting by committing . . . domestic abuse." *Id.* at 421. Thus, we do not consider the nine-year period helpful in determining Bilbro's regular way of acting.

Bilbro also argues that even if the time he spent in prison is not relevant to whether his abuse of A.B. is too distant to constitute a regular way of acting, the lack of evidence that he committed domestic abuse for five-and-a-half years following his release from

---

[7]    We are not suggesting that it is impossible for inmates to commit domestic abuse in prison, but restrictions on an inmate's liberty alter the circumstances that might otherwise allow the inmate to engage in their regular way of acting with family or household members. *See Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (citation omitted) (explaining that "imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen . . ."). In addition, there is no evidence in this particular case of any qualifying relationship Bilbro may have had while in prison, so his time in prison is not helpful in determining whether his regular way of acting involves domestic abuse. For these reasons, Bilbro's conduct during his nine years in prison is of limited relevance in determinining his regular way of acting.

15

prison demonstrates that domestic abuse is not his regular way of acting. We conclude that Bilbro's abuse of A.B. is sufficiently proximate in time to Daniels's murder to constitute a pattern despite the intervening five-and-a-half years. As we explained in *Heller*, "committing individual single acts of domestic violence against multiple different family or household members is sufficient to allow a jury to conclude that domestic abuse is the defendant's regular way of acting." 12 N.W.3d at 463–64. Here, the district court found that Bilbro made threats "all the time" during his relationship with A.B. The State established that Bilbro committed multiple, escalating acts of abuse against A.B. over the course of their one-year relationship: he pushed her causing her to fall, resulting in his conviction for gross misdemeanor domestic assault; he pushed her into the corner of a wall, causing a cut to her eye; and he stabbed her in the eye with a knife, attempting to kill her. After serving nine years in prison for attempting to murder A.B., Bilbro then committed a single act of domestic violence against Daniels only 47 days into their relationship, by stabbing her in the eye (and elsewhere) with a knife, killing her.

A five-and-a-half year gap between acts of domestic abuse does not disqualify a person's conduct from constituting a regular way of acting. Determining whether acts of domestic abuse are sufficiently proximate to a charged offense requires a fact-specific analysis. *See, e.g.*, *id.* at 464–65 (concluding that acts of abuse that occurred over a 20-year span were sufficiently proximate to constitute a pattern because the abuse occurred consistently every four to seven years). And this case is distinguishable from *Clark*, where acts of abuse were separated by 13 years of the couple living together without domestic disturbance. There is no similar record of a lasting period of nonviolence in Bilbro's

16

romantic or sexual relationships. And Bilbro's relationship with Daniels lasted only 47 days before he killed her. Spending 47 days in a relationship without committing violent acts reveals far less about a person's "regular way of acting" than 13 years elapsing in a relationship without any violent acts. Bilbro's acts of domestic violence against A.B. and Daniels are sufficiently proximate to constitute a regular way of acting and establish a pattern of domestic abuse.

We recognize that a five-and-a-half-year gap between incidents of domestic abuse could be too remote under a different set of facts not present here. From the specific facts of this case, however, we reject Bilbro's argument that the evidence of A.B.'s abuse is too remote to show that committing domestic abuse is Bilbro's regular way of acting.

Viewing the facts in the light most favorable to the district court's verdict, the evidence was sufficient to establish beyond a reasonable doubt that when Bilbro caused Daniels's death he committed domestic abuse in the course of his regular way of acting consistent with a past pattern of domestic abuse. We conclude, therefore, that the evidence was sufficient to support Bilbro's first-degree domestic-abuse murder conviction.

II.

Bilbro's second argument is that the district court violated his Sixth Amendment right to a sentencing jury when it imposed a sentence for arson. Bilbro argues that the district court's factual finding that Bilbro committed arson "for the purpose of concealing" Daniels's murder under Minn. Stat. § 609.035, subd. 4, violated his right to a sentencing jury because without that factual finding the district court could not have imposed a sentence for arson under Minn. Stat. § 609.035, subd. 1 (2024). We disagree. Because the

17

district court's factual finding under Minn. Stat. § 609.035, subd. 4, did not authorize a sentence beyond that permitted for the verdicts under the Minnesota Sentencing Guidelines, the district court did not violate the Sixth Amendment when it imposed a sentence for arson.

The parties disagree on the standard of review that applies to this claim. The State urges us to conduct a plain error analysis because, at the time of sentencing, Bilbro failed to object to the sentence imposed. But we need not decide whether a plain error, harmless error, or other standard applies because we conclude that there was no error as a matter of law; Bilbro's claim does not implicate his Sixth Amendment right to a jury. *See State v. Little*, 851 N.W.2d 878, 883–84 (Minn. 2014) (declining to decide whether a forfeiture or plain error standard applies to a *Blakely* claim because the same relief resulted under either standard).

We reject Bilbro's argument that *Blakely* applies to the district court's finding that Bilbro's arson was committed for the purpose of concealing a crime. In *Blakely*, 542 U.S. at 303, the United States Supreme Court considered whether judicial fact-finding that could subject a defendant to an aggravated sentence violated the defendant's Sixth Amendment right to a jury trial. There, the trial judge found that Blakely acted with "deliberate cruelty," which authorized the judge to sentence him to serve a sentence longer than the prescribed statutory maximum. *Id.* On review, the Court stated that the " 'statutory maximum' . . . is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* (emphasis in original). The Court held that

18

a judge cannot impose a sentence above the statutory maximum based on facts not found by a jury because doing so violates a defendant's right to trial by jury. *Id.* at 303–05.

In Minnesota, we have consistently held that, for the purposes of *Blakely*, "the maximum sentence a judge may impose solely on the basis of facts reflected in the jury verdict or admitted by the defendant" is "the presumptive sentence prescribed by the Minnesota Sentencing Guidelines." *State v. Shattuck*, 704 N.W.2d 131, 141 (Minn. 2005) (citation omitted) (internal quotation marks omitted); *see also State v. Rourke*, 773 N.W.2d 913, 919 (Minn. 2009) ("For most felony offenses, the maximum sentence authorized by a guilty plea or guilty verdict is the top of the presumptive sentencing range provided in the Minnesota Sentencing Guidelines' grid because the guidelines expressly require a district court to pronounce a sentence within the range on the grid." (footnotes omitted)).

Minnesota Statutes section 609.035 provides that "if a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them." Minn. Stat. § 609.035, subd. 1. One "purpose of this statute is 'to limit punishment to a single sentence where a single behavioral incident result[s] in the violation of more than one criminal statute.' " *State v. Bookwalter*, 541 N.W.2d 290, 293 (Minn. 1995) (alteration in original) (quoting Minn. Stat. § 609.035 advisory comm. cmt (West 1987)[8]). Another is "to protect against exaggerating the criminality of a person's conduct and to make both punishment and prosecution commensurate with culpability."

---

[8]   The advisory committee comment quoted was included with the statute when it was originally enacted in 1963.

*State ex rel. Stangvik v. Tahash*, 161 N.W.2d 667, 672 (Minn. 1968). The statute does not protect a constitutional right; instead, it is a legislatively created rule for sentencing that generally *limits* the punishment an offender can receive. *See Bookwalter*, 541 N.W.2d at 294. The statute also lists exceptions to its general limitation on multiple punishments for a single behavioral incident; that is, for certain excepted offenses, it does not bar the imposition of multiple sentences for offenses committed during a single behavioral incident. Minn. Stat. § 609.035 (2024).

Arson committed for the purpose of concealing a crime is one such enumerated exception. Minn. Stat. § 609.035, subd. 4. If a defendant is convicted of arson and another crime and the district court determines that the arson was committed to cover up the other crime, the court may sentence the defendant for both crimes without running afoul of the general rule set forth in Minn. Stat. § 609.035, subd. 1.

Here, Bilbro argues that the district court's finding that his arson was committed to conceal a crime resulted in the imposition of an additional sentence pursuant to the exception under section 609.035 that was otherwise not authorized. Bilbro asks us to expand *Blakely* by holding that a judge's finding of fact that authorizes the *imposition* of a sentence based on the arson exception in Minn. Stat. § 609.035, subd. 4, violates the Sixth Amendment.

We cannot conclude that the *Blakely* decision requires a jury determination in this circumstance. The district court found Bilbro guilty of both first-degree domestic-abuse murder and arson. Although Minn. Stat. § 609.035, subd. 1, limits imposition of sentences for crimes occurring in a single behavioral incident, subdivision 4 specifically permits a

20

court to sentence a defendant for arson *and* for another crime where arson is part of the same behavioral incident as the other crime and is committed for the purpose of concealing the crime. Here, the district court found that Bilbro committed arson for the purpose of concealing Daniels's murder, permitting imposition of a guideline sentence for arson in addition to first-degree murder. Neither sentence the district court imposed exceeded the sentencing guidelines. Minn. Sent. Guidelines 2.F.2.a.(1)(ii). In other words, the district court's finding of fact did not authorize a sentence beyond that permitted for the verdicts under the Minnesota Sentencing Guidelines. Instead, because the district court's finding of fact determined only whether a sentence could be imposed for an offense under Minn. Stat. § 609.035, this case does not implicate the Sixth Amendment right to a jury under *Blakely*.[9] Accordingly, no sentencing jury was required, and the district court did not err by making a factual finding under Minn. Stat. § 609.035, subd. 4.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.

---

[9] Bilbro argues that in *Erlinger v. United States*, 602 U.S. 821 (2024), the United States Supreme Court extended *Blakely* to apply to any fact that is essential to punishment a court imposes. In *Erlinger*, the Court stated that a jury is required for "every fact essential to an offender's punishment." *Id.* at 832. Bilbro argues that because the district court's finding of fact under Minn. Stat. § 609.035, subd. 4, allowed it to impose a sentence for arson, the finding was essential to his punishment and therefore a sentencing jury was required. Bilbro's argument misconstrues *Erlinger*. The *Erlinger* Court relied on and affirmed the rule of *Blakely*: "[a] fact that increases a defendant's exposure to punishment, whether by triggering a higher maximum *or* minimum sentence, must be submitted to a jury and found unanimously and beyond a reasonable doubt." *Id.* at 833 (alteration in original) (emphasis in original) (citation omitted) (internal quotation marks omitted). *Erlinger* does not represent a departure from or expansion of *Blakely*.